No. 2—10—0180
Opinion filed April 27, 2011

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| GUNTHER GASSNER | ) | Appeal from the Circuit Court of |
| | ) | Lee County. |
| Plaintiff-Appellant and | ) | |
| Cross-Appellee, | ) | |
| | ) | |
| v. | ) | No. 08—L—35 |
| | ) | |
| RAYNOR MANUFACTURING COMPANY, | ) | |
| | ) | Honorable |
| Defendant-Appellee and | ) | Daniel A. Fish, |
| Cross-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Burke concurred in the judgment and opinion.

**OPINION**

On May 30, 2000, plaintiff-appellant and cross-appellee, Gunther Gassner, sustained a work-related back injury and, following surgery for the injury, a staphylococcal (staph) infection originating in his back area. On May 1, 2002, in settlement thereof, the Industrial Commission (Commission) approved a "settlement contract" between Gassner and his employer, defendant-appellee and cross-appellant, Raynor Manufacturing Company (RMC). The settlement contract contained an "open medical provision," the scope of which is at the center of the instant appeal. In that provision, despite

Gassner's general release, RMC agreed to pay for certain approved treatment for a year following the Commission's approval of the settlement contract. After the approval, the staph infection spread to Gassner's heart, and Gassner incurred approximately $190,000 in medical expenses for treatment to his heart. Gassner thought that the open medical provision covered the expenses related to the staph infection surrounding his heart (provided he could prove that it was the *same* staph infection that began in his back), but RMC disagreed.

On October 31, 2008, Gassner petitioned for entry of judgment pursuant to section 19(g) of the Illinois Workers' Compensation Act (Act), which allows for a circuit court to enter judgment in accordance with an arbitration award (or a Commission-approved settlement contract). 820 ILCS 305/19(g) (West 2008). RMC moved to dismiss, arguing that the statute of limitations barred Gassner's claim. The trial court denied the motion to dismiss. RMC then moved for summary judgment, and the trial court granted the motion. Gassner appeals, arguing that the trial court erred in granting summary judgment to RMC. RMC maintains that summary judgment was proper, but it cross-appeals, arguing that the trial court erred in denying its motion to dismiss. For the reasons that follow, we affirm the trial court's denial of RMC's motion to dismiss, we reverse the trial court's grant of summary judgment to RMC, and we remand the cause.

## I. BACKGROUND

On May 30, 2000,[1] Gassner fell down the stairs while at work for RMC. As a result, Gassner

---

[1] There is some confusion regarding the date of the initial injury. In his brief, Gassner states that the initial injury occurred on November 1, 1999. However, the settlement contract states that the initial injury occurred on May 30, 2000. In its brief, RMC attempts to correct Gassner, noting the discrepancy, and, in his reply brief, Gassner does not challenge the May 30, 2000, date.

suffered a herniated disk at L4-L5, which required a fusion that was performed on February 25, 2002. Following the surgery, Gassner developed a deep staph infection at the site of the surgical incision. He was treated with oral and intravenous antibiotics. Gassner and RMC subsequently entered into an agreement entitled "Illinois Industrial Commission Settlement Contract Lump Sum Petition and Order" (settlement contract). The settlement contract stated in pertinent part:

"Terms of Settlement: Attach a recent medical report signed by the physician who examined or treated the employee.

[RMC] offers and [Gassner] accepts the sum of $47,500 [less attorney fees and expenses], subject to approval by the Industrial Commission, in full settlement of all claims, known or unknown, including all claims for specific loss, temporary total compensation[,] or compensation pursuant to Sections 8(d)(1), 8(d)(2) or 8(f) of the Act resulting from said alleged accident of 5/30/00 and any other accident, injury, or aggravation of a pre-existing condition arising out of and in the course of [Gassner's] employment with [RMC] to the date he signed this contract, involving alleged disability to any portion of [Gassner's] anatomy. This general release includes but is not limited to the rights under Sections 8(a) and 19(h) of the Act, [which] are expressly and mutually waived. *** Liability, causality, necessity and propriety of certain medical care, and nature and extent of permanent disability are the matters in issue. This settlement shall not be construed as a commutation of or a substitution for periodic payments; rather it represents a compromise of each disputed issue and has been effectuated to terminate litigation. *Notwithstanding anything to the contrary contained herein, as additional consideration, [RMC] agrees to pay reasonable and necessary medical expenses for treatment to the low back causally related to the alleged injury of 5/30/00 for*

*a period of one year after the date of approval of this settlement contract, but not thereafter.*" (Emphasis added to the controversial "open medical provision.")

Additionally, the signature line of the contract, which Gassner signed, read:

"PETITIONER'S SIGNATURE. Attention, petitioner. Do not sign this contract unless you understand all of the following statements. I have read this document, understand its terms, and sign this contract voluntarily. I believe it is in my best interests for the Commission to approve this contract. I understand that I can present this settlement contract to the Industrial Commission in person. I understand that by signing this contract, I am giving up the following rights:

1. My right to a trial before an arbitrator;

2. My right to appeal the arbitrator's decision to the Commission;

3. My right to any further medical treatment, at the employer's expense, for the results of this injury;

4. My right to any additional benefits if my condition worsens as a result of this injury."

The Commission approved the settlement contract on May 1, 2002.

A few months later, in September 2002, Gassner began to experience chest pain, shortness of breath, and fever. By late October 2002, doctors diagnosed Gassner with septic pericardis near his heart, and Gassner underwent multiple surgeries as a result of the infection. Between May 1, 2002, and May 1, 2003, Gassner incurred $190,000 in medical expenses for treatment of his heart infection. Dr. Jeffrey Coe examined Gassner, and Dr. Coe provided the opinion that Gassner's heart infection was caused by the *same* bacteria responsible for Gassner's low back infection.

On October 1, 2003, Gassner petitioned the Commission to enforce[2] the settlement contract pursuant to sections 8(a) and 19(h) of the Act, seeking payment for expenses related to the heart infection. 820 ILCS 305/8(a), 19(h) (West 2008). On November 19, 2007, the Commission entered an order (which is contained in the record), noting that the parties had become involved in a disagreement concerning the interpretation of the "reasonable and necessary medical expenses" for which RMC was responsible under the open medical provision. The Commission found, however, that it lacked subject matter jurisdiction to hear the case, because the settlement contract stated that all statutory rights of review, including but not limited to the "rights under sections 8(a) and 19(h) of the Act, are expressly and mutually waived." The Commission then advised that Gassner could pursue relief in the circuit court under section 19(g) of the Act.

Nearly one year after the entry of the Commission's order, on October 31, 2008, Gassner petitioned the trial court for entry of judgment pursuant to section 19(g) of the Act, which states:

"(g) Except in the case of a claim against the State of Illinois, either party may present a certified copy of the award of the Arbitrator, or a certified copy of the decision of the Commission when the same has become final, when no proceedings for review are pending, providing for the payment of compensation according to this Act, to the Circuit Court of the

---

[2]Although Gassner's petition was entitled an *enforcement* petition, we note that the Commission has no authority to enforce its contracts (that is the province of the circuit court, as provided by section 19(g)). The Commission more accurately characterized the petition as one of *review* under section 19(h). 820 ILCS 305/19(h) (West 2008).

county in which such accident occurred or either of the parties are residents, whereupon the court shall enter a judgment in accordance therewith." 820 ILCS 305/19(g) (West 2008). In his section 19(g) petition, Gassner alleged that RMC did not pay all of the medical expenses that it had agreed to cover in the open medical provision. Gassner attached the bills in question, which in large part pertained to the staph infection surrounding his heart (which, according to Gassner, originated in his low back) and which totaled approximately $190,000. Gassner contended that these expenses were covered by the open medical provision because they were incurred between May 1, 2002, and May 1, 2003, and the open medical provision stated that RMC would "pay reasonable and necessary medical expenses for treatment to the low back causally related to the alleged injury of 5/30/00 for a period of one year after the date of approval of this settlement contract [*i.e.*, May 1, 2002], but not thereafter."

On December 9, 2008, RMC moved to dismiss pursuant to section 2—619 of the Code of Civil Procedure (Code) (735 ILCS 5/2—619 (2008)), arguing that Gassner's section 19(g) petition was time-barred. RMC asserted that the five-year limitations period set forth in section 13—205 of the Code applies because that section governs "awards of arbitration *** and all civil actions not otherwise provided for." 735 ILCS 5/13—205 (West 2008). RMC noted that Gassner's "purported" cause of action accrued on May 1, 2003, the last day on which Gassner could arguably seek compensation for his medical expenses, and that Gassner did not file his petition until October 31, 2008, more than five years later.

On April 30, 2009, the trial court denied RMC's motion to dismiss. The court found that the limitations period was tolled from October 1, 2003, to November 19, 2007, when Gassner's petition to enforce the settlement contract was pending before the Commission. The court reasoned that,

therefore, Gassner satisfied a five-year limitations period. Rather than end its analysis there, however, the court continued, stating that, in any case, the applicable limitations period was 10 years as set forth in section 13—206 of the Code, not 5 years as set forth in section 13—205. 735 ILCS 5/13—206 (West 2008). In reaching this conclusion, the court cited two cases that together represented an appellate court split on the appropriate time period within which a claimant must file for judgment under section 19(g) of the Act: *Blacke v. Industrial Comm'n*, 268 Ill. App. 3d 26 (1994) (Third District) (characterizing a section 19(g) action *based on an arbitration award* as an action to enforce liability resulting from a statute, *i.e.*, a "civil action[] not otherwise provided for," for which a 5-year limitations period was appropriate (735 ILCS 5/13—205 (West 2008))); and *Givens v. Givens*, 192 Ill. App. 3d 97 (1989) (First District) (characterizing a section 19(g) action *based on an approved settlement contract* as an action based on a "written contract[]" for which a 10-year limitations period was appropriate (735 ILCS 5/13—206 (West 2008))). The court noted that the instant case involved an approved settlement contract, and so it would follow *Givens*.

On October 28, 2009, RMC moved for summary judgment, arguing that the settlement contract did not cover the $190,000 in expenses incurred in treating Gassner's heart infection. RMC attached two affidavits to its motion for summary judgment, one by a claims adjuster, Evelyn Harper, and one by RMC's attorney, James M. O'Brien. Harper attested that RMC (through its insurer, St. Paul Travelers) had paid $24,000 for treatment *to Gassner's low back* between May 1, 2002, and May 1, 2003. O'Brien attested that the terms of the settlement contract obligated RMC to pay only "for *treatment to the low back* causally related to the alleged injury of 5/30/00 *for a period of one year after the date of approval of this settlement contract*, but not thereafter." (Emphases added to language of the settlement contract by O'Brien.) O'Brien stated that, based on his experience as a workers' compensation and personal injury attorney, he was familiar with the type of medical records

submitted by Gassner and that, upon his review, the only "*unpaid* medical treatment bills produced by Gassner that *might* pertain to '*treatment to the low back*' during the period from May 1, 2002[,] through May 1, 2003[,] are, *at most* [$283]." " (Emphases original to the affidavit.)

Each side argued on the motion for summary judgment through a written memo and at a hearing. RMC argued that, according to the "four corners" rule governing contracts, a court may not look beyond the plain language of a contract unless a facial ambiguity exists, and here no facial ambiguity exists. According to RMC, it was obligated to pay for future medical expenses only if those expenses met three conditions precedent:

> 1. The subject medical treatment had to be "treatment *to* the low back" (*i.e.*, not treatment "to" the head, knee, heart, lung, etc.).

> 2. The "treatment *to* the low back" had to occur between May 1, 2002, and May 1, 2003 ("for a period of one year after the date of approval of this settlement contract [May 1, 2002], but not thereafter"); and

> 3. The "treatment *to* the low back" occurring between May 1, 2002, and May 1, 2003, must be "causally related to the alleged injury of 5/30/00" (*i.e.*, not related to some new back injury, fall, auto accident, etc.). (Emphases added.)

RMC essentially contended that any factual question whether the heart infection was causally related to the initial injury (third condition precedent) is irrelevant because, as a matter of law, the treatment for Gassner's heart infection cannot be characterized as "treatment to the low back" (first condition precedent).

Gassner argued that "the term 'treatment to the low back' itself incorporates treatment for injuries causally related to that approved treatment." Gassner argued that, at least provisionally, a court may look to extrinsic evidence for the limited purpose of determining whether an ambiguity

exists. And, according to Gassner, a provisional review of the extrinsic evidence supports his interpretation of the phrase, "treatment to the low back." For example, when the parties entered into the settlement contract, Gassner had already undergone surgery directly to his back and was at that time undergoing physical therapy *as well as* treatment for the staph infection that began at the site of the surgical incision, for which RMC paid under the settlement contract. Gassner pointed out that treatment for the staph infection originating at the site of the incision was not administered directly to that site but, rather, was treated with intravenous and oral antibiotics. Thus, Gassner essentially argued that even RMC acknowledged some flexibility to the term "treatment to the low back," at least to the extent that "treatment to the low back" need not mean "treatment [administered] to the low back." Gassner further argued that workers' compensation case law supported his interpretation of the phrase "treatment to the low back," because the case law establishes that injuries causally related to those injuries arising out of and in the course of employment are compensable under the Act. See, *e.g.*, *International Harvester Co. v. Industrial Comm'n*, 46 Ill. 2d 238, 245 (1970); *Shell Oil Co. v. Industrial Comm'n*, 2 Ill. 2d 590, 595 (1954).

RMC responded that the cases to which Gassner cited in support of his position that the phrase "treatment to the low back" should be read to include treatment causally related to that approved treatment (*i.e.*, *Shell Oil* and *International Harvester*) are inapposite because they do not involve settlement contracts. Rather, they stand for the simple proposition that injuries causally related to those injuries arising out of and in the course of employment are compensable under the Act.

The trial court granted RMC's motion for summary judgment, finding dispositive O'Brien's affidavit. The court, citing *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257 (2004), stated that "a party may not rely upon his own unverified pleadings to oppose a motion for summary judgment

when [the] movant has supplied evidentiary material, which[,] if uncontradicted[,] would entitle him to judgment as a matter of law." The court noted that the affidavit was evidence that there are no unpaid medical bills pertaining to the treatment of the low back, while Gassner did not offer any evidence to the contrary. Based on this, the court concluded that "[RMC's] evidence goes unrefuted and must be accepted as true, leaving no issue of fact as to whether there are any unpaid bills arising out of [Gassner's] low back injury," and that, "[b]ecause [Gassner] has not offered any contrary evidence ***, the Court *does not get to consider the terms of the contract or whether an ambiguity exists.*"[3] (Emphasis added.) This appeal followed.

## II. ANALYSIS

## A. Statute of Limitations

---

[3]Although the trial court never directly addressed the issue of contract interpretation, it seemed to implicitly accept Gassner's interpretation. For example, the trial court stated: "[Gassner] offered *** no competent evidence supporting a claim [that he] has unpaid medical bills *arising out of his low back injury*"; "[Gassner] has offered *** only argument *** to establish which bills are unpaid and that they *arise out of [his] low back injury*"; and "[RMC's] evidence goes unrefuted and must be accepted as true, leaving no issue of fact as to whether there are any unpaid bills *arising out of his low back injury*." (Emphases added.) In other words, the trial court implicitly found that the contract would have provided for, or at least did not preclude, expenses related to the staph infection surrounding Gassner's heart, if only Gassner had offered "competent evidence" supporting his claim that the heart staph infection "ar[o]se out of his low back injury" and that bills for the treatment of the staph infection remained unpaid. On this point, we would disagree, as Gassner, through Dr. Coe's medical opinion and the bills attached to the petition, did provide competent evidence that the staph infection that affected Gassner's heart "arose out of his low back injury."

We first address RMC's cross-appeal. As a threshold matter, RMC contends that the trial court should have granted its motion to dismiss because Gassner's petition is barred by the statute of limitations. A statute of limitations' applicability to a cause of action presents a question of law, subject to *de novo* review. *Travelers Casualty & Surety Co. v. Bowman*, 229 Ill. 2d 461, 466 (2008).

RMC contends that section 13—205 of the Code controls. That section provides that "actions on *** awards of arbitration *** and all civil actions not otherwise provided for[] shall be commenced within 5 years next after the cause of action accrued." 735 ILCS 5/13—205 (West 2008). RMC notes that the action accrued May 1, 2003, one year after the settlement contract was approved (*i.e.*, the date by which any expenses covered by the contract would have been incurred), and that Gassner did not file his petition with the trial court until more than five years later, on October 31, 2008. In support of its position that a five-year limitations period should apply, RMC cites *Ahlers v. Sears, Roebuck Co.*, 73 Ill. 2d 259, 265 (1978), for the proposition that the Commission's approval of a settlement contract has the "legal effect" of an arbitration award. Though *Ahlers* was *not* a statute-of-limitations case, RMC uses the above-mentioned proposition as a stepping stone to reach its conclusion that the settlement contract at issue here should be treated as an arbitration award (subject to the section 19(g) remedy of reducing the arbitration award to judgment). RMC then relies upon *Blacke*, which characterized arbitration awards approved by the Commission and subject to enforcement under section 19(g) as actions arising from statute and, therefore, as "civil action[s] not otherwise provided for," governed by a five-year limitations period. (Internal quotation marks omitted.) *Blacke*, 268 Ill. App. 3d at 29.[4]

---

[4] It is not entirely clear why the *Blacke* court sought to establish an arbitration award as a "civil action[] not otherwise provided for," when section 13—205 sets forth a five-year limitations

Gassner responds that the trial court correctly determined that section 13—206 of the Code controls. That section provides that actions on written contracts "shall be commenced within 10 years next after the cause of action accrued." 735 ILCS 5/13—206 (West 2008). Gassner argues that a settlement contract should be characterized as a written contract and relies upon *Givens*, 192 Ill. App. 3d 97, which held the same. Gassner notes that, as the action accrued on May 1, 2003, and he filed his petition on October 31, 2008, he clearly did not violate the 10-year limitations period. We agree and see no reason to depart from *Givens*.

Finally, we reject RMC's argument that this court should consider the settlement contract to be an oral contract, subject to a five-year limitations period. RMC, relying on *Armstrong v. Guigler*, 174 Ill. 2d 281, 287 (1996), asserts that, where the language of a written contract is ambiguous such that a party requests the court to look to parol evidence to determine one of the contract's essential terms, then the contract is deemed oral for the purposes of determining the limitations period, and an oral contract is subject to a five-year limitations period. RMC posits that, from Gassner's perspective, the term "treatment to the low back" can at best be considered ambiguous and therefore Gassner will have to resort to parol evidence to support his claim.

We find that RMC has improperly extended the rule set forth in *Armstrong*, and therefore we reject RMC's argument. In *Armstrong*, the court held that, where one party is claiming breach of a written contract but the *existence* of that contract or one of its essential terms must be proven by parol evidence, the contract is deemed oral and the five-year statute of limitations applies. *Armstrong*, 174 Ill. 2d at 287. Here, parol evidence is not necessary to establish the *existence* of an

---

period for *both* arbitration awards and for civil actions not otherwise provided for. 735 ILCS 5/13—205 (West 2008).

essential term. Rather, the purpose of parol evidence in this case would be to interpret a term, the existence of which is evident.

Because we determine that a 10-year statute of limitations applies, we need not address whether the limitations period was tolled while Gassner attempted to assert his cause in the wrong forum.

### B. Summary Judgment

Gassner challenges the trial court's grant of summary judgment, arguing that the trial court erred in finding that O'Brien's affidavit was uncontradicted such that no question of fact remained whether there were any unpaid medical bills arising out of Gassner's low back injury and in thereby failing to reach the contract-interpretation issue. A summary judgment is a drastic remedy that is to be awarded and reviewed with care and caution. *Bloomer Amusement Co. v. Eskenazi*, 75 Ill. App. 3d 117, 118 (1979). A motion for summary judgment should be granted only where the pleadings, depositions, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2008). If the facts are not in dispute but are subject to conflicting inferences, or if a reasonable person can draw different inferences and conclusions from the undisputed facts, summary judgment is not appropriate. *Bloomer*, 75 Ill. App. 3d at 118-19. A grant of summary judgement is subject to *de novo* review. *Id* at 119.

### 1. The Court Erred in Failing to Reach the Contract-Interpretation Issue

As to whether the trial court properly granted RMC's motion for summary judgment, Gassner first argues that the trial court erred in finding that O'Brien's affidavit was uncontradicted such that no question of fact remained whether there were any unpaid medical bills arising out of Gassner's low

back injury and in thereby failing to reach the contract-interpretation issue. We agree with Gassner that the trial court erred on this point.

It is true that a party may not rely upon his or her own verified pleadings to oppose a motion for summary judgment when the movant has supplied evidentiary material, such as an affidavit, that, if uncontradicted, would entitle him or her to judgment as a matter of law. See, *e.g.*, *Abrams*, 211 Ill. 2d at 257. However, summary judgment affidavits must contain not conclusions but only evidentiary facts to which the affiant is capable of testifying. *Jones v. Dettro*, 308 Ill. App. 3d 494, 499 (1999) (citing Ill. S. Ct. R. 191(a) (eff. Aug. 1, 1992)). Unsupported assertions, opinions, and self-serving or conclusory statements do not comply with the rule governing summary judgment affidavits. *Id*.

Here, O'Brien attested that the terms of the settlement contract obligated RMC to pay only "for *treatment to the low back* causally related to the alleged injury of 5/30/00 *for a period of one year after the date of approval of this settlement contract*, but not thereafter." (Emphases added to language of the settlement contract by O'Brien.) O'Brien stated that, based on his experience as a workers' compensation and personal injury attorney, he was familiar with the type of medical records submitted by Gassner and that, upon his review, the only "*unpaid* medical treatment bills produced by Gassner that *might* pertain to '*treatment to the low back*' during the period from May 1, 2002[,] through May 1, 2003[,] are, *at most* [$283]." (Emphasis original to the affidavit.)

These statements are conclusory in that they assume the very interpretation of the open medical provision that Gassner challenges: that the term "treatment to the low back" means treatment administered to or directed at healing the low back only, not treatment for a spreading injury/illness that originated in the low back and not subsequently required treatment arising out of the approved treatment. O'Brien does not dispute that RMC refused to pay $190,000 in medical expenses that

Gassner incurred for the treatment of his heart infection, as set forth in Gassner's answers to various interrogatories and in his submission of medical records. Rather, O'Brien asserts that the settlement contract released RMC from any obligation that it may have otherwise had under the Act to pay for the treatment of Gassner's heart infection. Gassner's answers to RMC's interrogatories and his medical bills are sufficient to stand in response to O'Brien's affidavit. In sum, O'Brien's affidavit is insufficient to resolve the controversy as a matter of law, and the trial court erred in failing to address the contract-interpretation issue. Although the trial court failed to address the issue, we will do so because, as set forth below, the issue is subject to *de novo* review.

### 2. Contract-Interpretation Issue

The parties dispute the scope of the open medical provision, which is contained within the general release. A release is a contract and, therefore, is governed by contract law. *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1014 (2010). General words in the release are restrained by specific recitals contained in the document. *Id*. Releases are strictly construed against the benefitting party and must be written with great particularity. *Id*. Additionally, an oft-cited principle in release cases is that "[t]he intention of the parties controls the scope and effect of the release, and this intent is discerned from the release's express language as well as the circumstances surrounding the agreement." *Id*. (quoting *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 614 (2007)).

Courts have used two approaches in discerning the intent of the parties in typical contract-interpretation cases: the four corners rule and the provisional admission approach. The traditional, four corners rule of contract interpretation states:

"An agreement, when reduced to writing, must be presumed to speak to the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must

be determined from the language used. It is not to be changed by extrinsic evidence." (Internal quotation marks omitted.) *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999) (quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291 (1962)). In applying the four corners rule, a court initially looks to the language of the contract alone. *Id.* at 462. If the language of an agreement is facially unambiguous, then it is interpreted as a matter of law, *without* resort to parol (or extrinsic) evidence. *Id.* If, however, a facial ambiguity is present, then parol evidence may be admitted to aid the trier of fact in resolving the ambiguity. *Id.* at 462-63. Whether an ambiguity is present is a matter of law, subject to *de novo* review. *Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 783 (2002).

The provisional admission approach, also known as the extrinsic ambiguity approach, can be summed up as follows:

> "Under the provisional admission approach, although the language of [the] contract is facially unambiguous, a party may still proffer parol evidence to the trial judge for the purpose of showing that an ambiguity exists which can be found only by looking beyond the clear language of the contract. [Citation.] Under this method, an extrinsic ambiguity exists 'when someone who knows the context of the contract would know if the contract means something other than what it seems to mean.' [Citation.] *** [I]f, after 'provisionally' reviewing the parol evidence, the trial judge finds that an 'extrinsic ambiguity' is present, then the parol evidence is admitted to aid the trier of fact in resolving the ambiguity." *Air Safety*, 185 Ill. 2d at 463.

The theory behind the provisional admission approach is that it corrects for flaws inherent in a strict application of the four corners rule. According to advocates of the provisional admission approach, the four corners rule is flawed because "it assumes precision in language that cannot exist and

requires the judge to determine the true intent of the parties in a transaction that is removed from time and circumstances." *Id.* at 465. The provisional admission approach allows for the consideration of negotiations leading up to the agreement so that parties' use of particular words and phrases may be better understood. *Arrington v. Walter E. Heller International Corp.*, 30 Ill. App. 3d 631, 637 (1975). Therefore, the provisional admission approach is more similar to the oft-quoted principle in release cases, that "[t]he intention of the parties controls the scope and effect of the release, and this intent is discerned from the release's express language as well as the circumstances surrounding the agreement." (Internal quotation marks omitted.) *Janowiak*, 402 Ill. App. 3d at 1014.[5]

---

[5]Although releases are governed by contract law, we have found no release case discussing the four corners rule verses the provisional admission approach and favoring one approach over the other. However, release cases have repeatedly stated that the parties' intent is to be determined from the express language *as well as* the circumstances surrounding the agreement, which is more similar to the provisional admission approach. We leave for another court to determine whether what seems to be the current trend back to the four corners rule (see, *e.g.*, *River's Edge Homeowners' Ass'n v. City of Naperville*, 353 Ill. App. 3d 874, 880 (2004)) applies to release cases in particular.

A history of the debate between the four corners rule and the provisional admission approach runs as follows. In the 1980s and 1990s, Illinois appellate courts frequently applied the provisional admission approach. *Air Safety*, 185 Ill. 2d at 463-64 (citing *Ahsan v. Eagle, Inc.*, 287 Ill. App. 3d 788, 790 (1997), *Meyer v. Marilyn Miglin, Inc.*, 273 Ill. App. 3d 882, 889 (1995), *USG Corp. v. Sterling Plumbing Group, Inc.*, 247 Ill. App. 3d 316, 318 (1993), *Rybicki v. Anesthesia & Analgesia Associates*, *Ltd.*, 246 Ill. App. 3d 290, 298-300 (1993), *Zale Construction Co. v. Hoffman*, 145 Ill. App. 3d 235, 241-42 (1986), *URS Corp. v. Ash*, 101 Ill. App. 3d 229, 234-35 (1981), and *Keep*

_____

*Productions, Inc. v. Arlington Park Towers Hotel Corp.*, 49 Ill. App. 3d 258, 263 (1977)). Federal courts have also acknowledged that Illinois intermediate courts frequently applied the provisional admission approach. See *Home Insurance Co. v. Chicago & Northwestern Transportation Co.*, 56 F.3d 763, 767-69 (7th Cir. 1995). However, the Illinois Supreme Court in *Air Safety* expressly declined to rule on whether the provisional admission approach may be used when the contract at issue does not contain an express integration clause. *Air Safety*, 185 Ill. 2d at 464 n.1.

Shortly after the release of *Air Safety*, Illinois appellate courts continued to apply the provisional admission approach. See, *e.g.*, *Fleet Business Credit v. Enterasys Networks*, 352 Ill. App. 3d 456, 470 (2004) (First District) (citing *Air Safety* as though *Air Safety* had adopted the approach rather than merely acknowledging it and refraining from ruling on its propriety). A federal court predicted that, following *Air Safety*, Illinois courts would ultimately adopt the provisional admission approach. See *Evergreen Investments, LLC v. FCL Graphics, Inc.,* 334 F.3d 750, 756 (8th Cir. 2003) (stating that there is no evidence to suggest that the Illinois Supreme Court will categorically reject the provisional admission approach and further stating that, when a state's highest court has not yet ruled on an issue, the federal court must follow the decisions of the state's intermediate courts).

However, in 2004, this court in *River's Edge* stated that we were bound to follow the four corners approach as set forth in the Illinois Supreme Court case of *Armstrong Paint & Varnish Works v. Continental Can Co.*, 301 Ill. 102, 106 (1921). *River's Edge*, 353 Ill. App. 3d at 880. We implicitly found that none of the Illinois appellate decisions applying the provisional admission approach were proper, reasoning that "[a]fter the supreme court has declared the law with respect to an issue, this court must follow that law because only the supreme court has the authority to

In any case, under both the four corners rule and the provisional admission approach, the first step is to determine whether an ambiguity exists. An ambiguity exists where there is doubt as to the true sense or meaning of the words themselves or an indefiniteness in the words' expression, resulting in a difficulty in the application of the words under the circumstances of the dispute that the contract is supposed to govern. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004); 18 Christine Gimeno *et al.*, Ill. L. & Prac. Evidence §290 (2011) (using the "difficulty in application" definition) (citing *Martindell v. Lake Shore National Bank*, 15 Ill. 2d 272, 280-81 (1958)

---

overrule or modify its decisions." (Internal quotation marks omitted.) *Id.* (quoting *Illinois Labor Relations Board v. Chicago Transit Authority*, 341 Ill. App. 3d 751, 758 (2003)). We therefore found we were bound to follow the four corners rule. *Id.*

The First District has cited *River's Edge* with approval, and federal courts have now predicted that a strict application of the four corners rule will become the law in Illinois. See *Lease Management Equipment Corp. v. DFO Partnership*, 392 Ill. App. 3d 678, 686 (2009) (First District) (adopting the *River's Edge* rationale); *In re Montgomery Ward & Co.*, 428 F.3d 154, 162 nn.18-19 (3rd Cir. 2005) (recognizing Pennsylvania to be more permissive than Illinois in that it allows for the admission of extrinsic evidence to establish a latent ambiguity and stating that, following *Air Safety*, Illinois appellate courts will probably more strictly adhere to the four corners rule); *Union Pacific R.R. Co. v. Kansas City Southern Ry Co.*, No. 07—CV—0320—MJR (S.D. Ill. Aug. 3, 2009). But see *Bright Horizons Children's Centers, LLC v. Riverway Midwest II, LLC*, 403 Ill. App. 3d 234, 247 (2010) (First District) (reciting the provisional admission approach without acknowledging a shift since *River's Edge*); *Janowiak*, 402 Ill. App. 3d at 1014 (regarding the standard by which parties' intent in forming a release is to be discerned).

(finding ambiguous the phrase " '[*d*]*ebentures paid and discharged by the new corporation shall not thereafter be available for purchase by the Buyer under [the] option*' " (emphasis added) because, if one considers the primary relationship between the parties to be that of lender and borrower, the option granted by the agreement seems to be an unconditionally revocable offer, but, in the context of the case, if one considers the primary relationship between the parties to be that of buyer and seller, then the option was not revocable at the seller's whim and only those debentures paid and discharged in the normal course of business would no longer be available for purchase by the buyer)). Additionally, when dealing with a settlement contract involving a work injury that would be covered under the Act, a court construes the contract strongly against the drafter, *and the risk of ambiguity and lack of clarity is on the drafting party. Johnson v. State*, 55 Ill. Ct. Cl. 410, 412 (2002) (dealing specifically with such a settlement contract); see also *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479 (1998) (ambiguity in the contract must be resolved against the drafter of the disputed provision).[6]

With this background, we proceed to determine whether the disputed language in the contract is ambiguous so as to require the introduction of parol evidence and preclude summary judgment. The disputed language reads:

"Notwithstanding anything to the contrary contained herein, as additional consideration, [RMC] agrees to pay reasonable and necessary medical expenses for treatment to the low

---

[6] We acknowledge that the concept of *resolving* ambiguities against the drafter, as is typically expressed in cases such as *Gleason*, is premature to our summary judgment analysis, which does not seek to resolve an ambiguity but seeks to determine if an ambiguity exists. It is for that reason that we have cited *Johnson*, which expresses the drafter's burden in a manner more on point to the instant case.

back causally related to the alleged injury of 5/30/00 for a period of one year after the date of approval of this settlement contract, but not thereafter."

In particular, the parties dispute whether the phrase "treatment to the low back" creates a facial ambiguity. Black's Law Dictionary defines the word "treatment" as "[a] broad term covering all the steps taken to effect a cure of an injury or disease; including examination and diagnosis as well as application of remedies." Black's Law Dictionary 1502 (6th ed. 1990). Dorland's Medical Dictionary defines "treatment" as "the management and care of a patient for the purpose of combating disease or disorder." Dorland's Medical Dictionary 1388 (26th ed. 1981).

Gassner's primary argument is that the plain language of the open medical provision includes treatment for the *heart* staph infection, provided that he can establish that the heart staph infection was the same infection that originated in his low back and was causally related to the initial injury. That would, of course, be an issue for trial. Thus, Gassner requests that this court remand the cause for a determination of whether the staph infection surrounding his heart was the same infection that originated in his low back and was causally related to his initial injury. Alternatively, Gassner contends that the terms of the open medical provision are, at the very least, ambiguous, requiring a remand for a determination of the parties' intent regarding the scope and extent of the open medical provision. Gassner notes that RMC was well aware of the staph infection, then localized near the site of the surgical incision, when the parties entered into the open medical provision, and he posits that the open medical provision was an acknowledgment of and agreement to pay for Gassner's then-unresolved health issue (the staph infection) for the next year only.

RMC, on the other hand, argues that the plain language of the open medical provision includes treatment administered to or directed at healing the low back *only*, regardless of whether a condition originating in the low back spreads to other parts of the body. At oral argument, RMC set

forth that it was aware that Gassner had a staph infection when the parties entered into the settlement contract, and it noted that it (RMC) had paid for treatment of Gassner's staph infection *up to that point*. However, it was RMC's position that the term "treatment to the low back" *unambiguously* excluded treatment of the staph infection and released RMC from any further duty to pay for such treatment. In other words, RMC posited that the purpose of the open medical provision was to limit its obligation to paying for treatment to the low back (in the muscular-skeletal, chiropractic sense), so long as it was causally related to the initial injury, for a term of one year,.

RMC's preferred reading of the open medical provision, *i.e.*, that it was not obligated to pay for treatment of the staph infection even while it remained localized in the low back, is not obvious from the language of the provision. To the contrary, absent any parol evidence, we read the term "treatment to the low back" to include treatment for a staph infection manifesting in the low back—the open medical provision does not specify the *type* of low-back medical condition (muscular-skeletal injury or infectious illness) and requires only that the low-back condition be causally related to the initial injury. RMC, as the drafter of the settlement contract, should have set forth the terms of the release with a greater degree of clarity. If it meant to exclude treatment for the staph infection, it should have so stated.

Once one considers the obligation to pay for treatment as including an *infection* manifesting in the low back, it becomes difficult to define the limits of the obligation. Assuming that the facts later show that the infection in the heart was the *same* infection as that originating in the back, is RMC obligated to pay for treatment aimed at the *infection* or merely for treatment aimed at the resulting *damage*? The former interpretation is more consistent with the term "treatment," *i.e.*, a broad term covering all steps to effect a cure, while the latter more readily lends itself to literal compliance with the open medical provision's reference to the "low back."

The fact that the health issue for which coverage is disputed is an *infection*, as opposed to a more discrete injury such as a broken arm, creates the greatest difficulty in applying the terms of the open medical provision. By way of counter-example, if, within the year following the approval of the settlement contract, the initial injury caused Gassner to have a spasm that in turn caused him to fall and break his arm, treatment for his arm would not be covered under the open medical provision. Even though the broken arm would arguably be causally related to the initial injury, it would not be covered because its treatment could in no way be construed as treatment to the low back. In contrast, treatment of an *infection* originating in the low back, once bloodborne, is not so easily localized. The infection was not treated at the site of origin but, rather, was treated by intravenous and oral antibiotics. If Gassner is able to establish before a trier of fact that the infection surrounding his heart was the *same* infection as the one that originated in his low back, then, in order to "treat" the infection that originated in the low back, *i.e.*, in order to "effect a cure of the [condition]," it would seem that one would have had to treat the entire infection, however it may have manifested, evolved, or spread.

In sum, even under a four corners approach, the contract is ambiguous. The open medical provision does not, as a matter of law, exclude treatment for Gassner's staph infection. Summary judgment was therefore inappropriate. Should Gassner continue to pursue his claim in the trial court, we allow for the introduction of (reliable) parol evidence to determine the intent of the parties in entering into the release and in creating the open medical provision. Whether the parties created the open medical provision to include or exclude treatment of the staph infection is a question of fact to be decided in the trial court, as is the question of whether the staph infection that damaged Gassner's heart is the *same* infection that originated in his low back as a result of the low back surgery that corrected the initial work injury.

## III. CONCLUSION

For the aforementioned reasons, we affirm the trial court's denial of RMC's motion to dismiss, we reverse the trial court's grant of RMC's motion for summary judgment, and we remand the cause.

Affirmed in part and reversed in part; cause remanded.