WOOD, Circuit Judge,
concurring in part and dissenting in part.
Wilson is entitled to overcome CEC’s motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) only if he can show either (1) that CEC breached its contract with him, or (2) that it was unjustly enriched by its decision to stop bonuses for students who had not completed a year of study or a course as of February 2011, or (3) that he has stated a claim on the question whether CEC committed an independent violation of the implied covenant of good faith and fair dealing implicit in his contract with the company. I address those three points in turn, applying a de novo standard of review and drawing all inferences in Wilson’s favor. Reger Dev., LLC v. Nat’l City Bank, 592 F.3d 759, 763 (7th Cir.2010).
I. Breach of Express Contract
A. Choice of Law
At the outset, the parties dispute whether Illinois or Minnesota law applies. Wilson prefers the law of Illinois, and CEC that of Minnesota. I do not see what the fuss is about: the parties agree that there is no substantive difference between- the laws of these two states. In either one, to establish a breach of contract a party must show (1) that a valid and enforceable contract existed, (2) that the plaintiff performed on the contract, (3) that the defendant breached it, and (4) that the plaintiff was injured. Priebe v. Autobarn, Ltd., 240 F.3d 584, 587 (7th Cir.2001) (citing Hickox v. Bell, 195 Ill.App.3d 976, 142 Ill.Dec. 392, 552 N.E.2d 1133, 1143 (1990)); Parkhill v. Minn. Mut. Life Ins. Co., 174 F.Supp.2d 951, 961 (D.Minn.2000). When the law is the same *684 in both states, rather than grappling with the largely theoretical question of which law applies, the court should apply the law of the forum state, here Illinois. Kochert v. Adagen Med. Int’l, Inc., 491 F.3d 674, 677 (7th Cir.2007); Barron v. Ford Motor Co. of Can., Ltd., 965 F.2d 195, 197 (7th Cir.1992). I proceed on that basis.
B. Enforceability of Contract
Both parties question whether this contract was illusory and therefore unenforceable: CEC argues that the right to bonuses under the contract is not enforceable because it reserved the right to terminate the Plan at any time, while Wilson argues in the alternative that the contract is enforceable, but if it is not, then it is illusory and no barrier to his unjust enrichment claim.
Initially, it is important to recall that Illinois courts look at the contract as a whole, not each particular clause, when they consider whether a particular agreement is illusory. See, e.g., Keefe v. Allied Home Mortg. Corp., 393 Ill.App.3d 226, 332 Ill.Dec. 124, 912 N.E.2d 310, 315 (2009). Bearing that in mind, this court has held that a statement of an employer’s compensation policy reflects at most an illusory contract if it does not provide a specific enough promise to be enforceable. Tatom v. Ameritech Corp., 305 F.3d 737 (7th Cir.2002). In Tatom, the Compensation Statement identified a target bonus of $50,500, but it said that the bonus could be more or less “depending on Corporate and business unit financial results, as well as [the employee’s] individual performance.” Id. at 743. That Compensation Statement also expressly “d[id] not constitute a guarantee that any particular amount of compensation will be paid” and it “d[id] not create a contractual relationship or any contractually enforceable rights between [the employer] and the employee.” Id. We found the Compensation Statement too vague to be an enforceable promise. But we explained that a statement of an employer’s compensation policy could support an enforceable contract if “the language of the statement sets forth a promise in terms clear enough to cause a reasonable employee to believe that an offer has been made,” the employee is aware of the statement and reasonably construes it to be an offer, and the employee accepts the offer by commencing or continuing to work after reading the statement. Id. at 742.
CEC’s Plan is far more specific than the Compensation Statement in Tatom. The statement in Tatom did not provide enough details of how supplemental compensation would be calculated to allow a determination of what the employer would owe the employee or when it was obligated to pay additional compensation. It set a target for a bonus, but it said that the bonus could be more or less depending on employee performance and business performance, without specifying how these factors would influence the ultimate decision. In contrast, CEC’s Plan transparently indicates how to calculate the bonus payments to which Wilson was entitled before February 28, 2011. Indeed, it is also easy to see how much he would have earned for the period between March and June 2011, if his students remained enrolled and the Plan had not been terminated. Finally, the bonus was just one part of Wilson’s overall agreement. I therefore conclude that there is nothing illusory in the promises CEC made, and that the Plan is an enforceable contract. This conclusion flows from the language of the agreement itself. I therefore do not agree with Judge Hamilton’s suggestion that Wilson should have another opportunity on remand to amend his pleadings to restore the theory of an illusory contract to the case. Principles of law of the case should *685 bar any such move; CEC will equally be bound by what has been decided here.
C. Breach
The next question is whether CEC breached its express agreement with Wilson. (I discuss in part III the question whether there was a breach of contract based on the implied covenant of good faith and fair dealing.) As Wilson reads the- Plan, CEC was contractually obligated to pay him $9,200 in bonuses for the 23 students whom he enrolled in the second and third quarters of 2010. These people were “in the pipeline” to complete a full course of study between March and June 2011, although there was a chance that one or more might not do so. He argues that with respect to these students, his “work was completed; each student was enrolled and now it was up to them to remain enrolled or graduate their program.” At least with hindsight, it would be easy enough to see how many students satisfied that remaining criterion in the Plan and thus how much of a bonus Wilson earned. But by pointing out that he had to wait for the students to complete a year or to graduate, Wilson has highlighted the problem with his position: CEC’s obligation to pay a bonus was not tied solely to Wilson’s performance; it depended equally on the success of the students. (For what it is worth, I see nothing outrageous about this arrangement: it appears to have been designed to prevent any temptation on the recruiter’s part to stack the classrooms with “students” who have no intention of completing serious work, by specifying that the bonus is earned only for successful students. Compare Leveski v. ITT Educ. Servs., Inc., 719 F.3d 818 (7th Cir.2013) (qui tam action implicating ED rule against compensation based on student recruitment).)
The Plan expressly provided for the possibility that Wilson would substantially perform but nonetheless not be eligible for a bonus. This could happen in any of three ways: students could drop out, Wilson’s employment could be terminated, or, as happened here, CEC could exercise its right to terminate the Plan. The Plan states (and Wilson concedes) that in either of the first two scenarios, he would not be entitled to bonuses for the pipeline students. I cannot see why he would be entitled to a bonus based on the same substantial performance in the third scenario, where the only difference between that one and the first two is that CEC’s exercise of an agreed retained power, rather than the student’s attendance or Wilson’s employment, is the reason why the Plan is changed before the student finishes a year or a course of study. Though Wilson was understandably disappointed by not receiving the bonuses he hoped for, he should have realized that this was possible in light of the provisions of the Plan.
Even if the Plan could be terminated or amended, however, Wilson urges this court to find that CEC’s action was impermissibly retroactive as applied to bonuses that would have been earned between March through June 2011 (assuming no glitches). But this is just another way of putting the argument I have just rejected. CEC did pay Wilson all bonuses he had earned as of February 28, 2011. The Plan would have been terminated retroactively only if CEC had refused to pay Wilson bonuses for students who completed a full course or year of study on or before February 28, 2011. Wilson analogizes this case to one in which the District of Connecticut (applying Connecticut law) concluded that an employer who managed a restaurant discount club breached its compensation agreement by retroactively altering the commission rate for a representative who solicited restaurants to participate in the discount club. *686 Quiello v. Reward Network Establishment Servs., Inc., 420 F.Supp.2d 23 (D.Conn.2006). Without delving into all the details of that case, I note that the representative there was entitled to a percentage of each customer’s expenditure (specified by the agreement in force when he registered the restaurant) at the time the customer went to the restaurant; there were no further conditions that he had to satisfy once the customer spent the money. Here there were such conditions. This case would be analogous to Quiello if Wilson’s 23 extra students had already completed one year of study when the Plan ended in February 2011, entitling Wilson to 23 bonuses of $400, but CEC had attempted to subject Wilson to a new Plan, under which representatives were paid $200 per student rather than $400, and it then had paid Wilson only $200 for students who had completed their courses before the new Plan came into force. In my view, Quiello thus is not even helpful persuasive authority for Wilson.
II. Unjust Enrichment
Because I find that a valid, enforceable agreement governed the relationship between Wilson and CEC, it follows for me that Wilson’s unjust-enrichment claim cannot succeed. Restitution is an extraordinary remedy. Where no contract exists, the court constructs an imaginary agreement (an “implied” contract) because the plaintiff conferred a benefit on the defendant under. the mistaken belief that a contract existed. Under those circumstances, “the defendant’s retention of the benefit violates the fundamental principles of justice, equity, and good conscience.” Hess v. Kanoski & Assocs., 668 F.3d 446, 455 (7th Cir.2012) (quoting A.P. Props., Inc. v. Rattner, 2011 IL App (2d) 110061, 355 Ill.Dec. 736, 960 N.E.2d 618, 621 (2011)). The purpose of restitution is to create a substitute for the contract that does not exist, not to upset the allocation of risk that is reflected in an existing agreement. Id. (“A plaintiff cannot pursue [restitution], however, if his relationship with a defendant is governed by an express contract.”); Util. Audit, Inc. v. Horace Mann Serv. Corp., 383 F.3d 683, 689 (7th Cir.2004) (“The reason for prohibiting a claim of unjust enrichment between contracting parties is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract.”); Hayes Mech., Inc. v. First Indus., L.P., 351 Ill.App.3d 1, 285 Ill.Dec. 599, 812 N.E.2d 419, 426 (2004) (“A quasi-contract, or contract implied in law, is one in which no actual agreement between the parties occurred, but a duty is imposed to prevent injustice.”).
Wilson agreed to recruit students in exchange for his ordinary salary and the potential that some of his enrolled students would complete a full year or a full course of study, thereby entitling him to a bonus. In other words, the potential of earning a bonus, not the guarantee of earning one, was part of the consideration for Wilson’s performance. In essence, Wilson is arguing that any agreement that conditions benefits on factors outside the employee’s control might become the basis for a restitution claim. That is not the law; to the contrary, restitution is not a remedy for a party whose “expectations were not realized under the contract.” Util. Audit, Inc., 383 F.3d at 689. I thus conclude that Wilson cannot prevail under an unjust-enrichment theory.
III. Covenant of Good Faith and Fair Dealing
Finally, Wilson argues that CEC breached the contract in a different way, by violating its obligation of good faith and *687 fair dealing when it amended the Plan in February, rather than waiting until the deadline of July 2011 when the regulations came into effect. Illinois courts hold that every contract rests on good faith and fair dealing between the parties. See Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir.1992), citing Martindell v. Lake Shore Nat’l Bank, 15 Ill.2d 272, 154 N.E.2d 683, 690 (1958); First Nat’l Bank of Cicero v. Sylvester, 196 Ill.App.3d 902, 144 Ill.Dec. 24, 554 N.E.2d 1063, 1069 (1990). But critically from my point of view, Illinois courts also hold that the covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract. As the Illinois Appellate Court said in Anderson v. Burton Assocs., Ltd., 218 Ill.App.3d 261, 161 Ill.Dec. 72, 578 N.E.2d 199 (1991), “[w]hile it is true that this obligation exists in every contract in Illinois, (see Martindell v. Lake Shore Nat’l Bank (1958), 15 Ill.2d 272, 154 N.E.2d 683), it is essentially used as a construction aid in determining parties’ intent, (Martin v. Federal Life Ins. Co. (1982), 109 Ill.App.3d 596, 65 Ill.Dec. 143, 440 N.E.2d 998) and ‘vague notions of fair dealing’ do not form the basis for an independent tort. Foster Enters. v. Germania Fed. Sav. (1981), 97 Ill.App.3d 22, 52 Ill.Dec. 303, 421 N.E.2d 1375.” 161 Ill.Dec. 72, 578 N.E.2d at 203 (parallel citations omitted); see also Beraha, 956 F.2d at 1443-44 (“A lack of good faith does not by itself create a cause of action like a failure to exert best efforts creates when a contract contains an implied best efforts obligation. Instead, the covenant guides the construction of explicit terms in an agreement.”) (citation omitted).
Before one turns to this covenant of good faith and fair dealing, it is therefore necessary to find that the contract in question is susceptible to more than one interpretation. The Illinois Supreme Court put it this way in Martindell: “Every contract implies good faith and fair dealing between the parties to it, and where an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted.” 154 N.E.2d at 690 (emphasis added). To say that a contract is susceptible of two conflicting constructions is, in my opinion, another way of saying that it is ambiguous. It is well established that a party who can show that a contract is ambiguous is entitled to survive summary judgment and to introduce evidence that will resolve the ambiguity. The Illinois Appellate Court discussed this rule in Gassner v. Raynor Mfg. Co., 409 Ill.App.3d 995, 350 Ill.Dec. 246, 948 N.E.2d 315 (2011), as follows:
In any case, under both the four corners rule and the provisional admission approach, the first step is to determine whether an ambiguity exists. An ambiguity exists where there is doubt as to the true sense or meaning of the words themselves or an indefiniteness in the words’ expression, resulting in a difficulty in the application of the words under the circumstances of the dispute that the contract is supposed to govern.... [Accordingly,] ... we proceed to determine whether the disputed language in the contract is ambiguous so as to require the introduction of parol evidence and preclude summary judgment.
Id., 350 Ill.Dec. 246, 948 N.E.2d at 328 (citations omitted).
If, as I believe, the Plan is an unambiguous contract, then the background covenant of good faith and fair dealing has no role to play in its interpretation. (No one is saying that this is an illegal contract, nor has Wilson offered an unconscionability argument; even if he had, it is my belief that there is nothing unconscionable about the compensation structure to which he agreed.) The majority relies heavily on *688 the fact that the Plan is silent about the particular set of circumstances that unfolded here. But no contract ever spells out how the parties plan to address every tiny detail that might arise in the future. Instead, contracts allocate risk more generally. This contract did everything that was necessary when it provided a default rule stating that “CEC reserves the right to terminate or amend the terms of this Plan at any time, for regulatory compliance purposes or for any other reason that CEC determines, in its sole discretion.” That does not look like silence to me. It is an unambiguous term that gives CEC the right to terminate the Plan at any time, for any reason, as Judge Darrow agrees, supra at 671-72. That means that there is no basis for invoking the covenant of good faith and fair dealing as a principle of construction. Martindell, 154 N.E.2d at 690. Unless that covenant enters the picture, there is no way to override plain contractual language (which reflects Wilson’s acceptance of a certain amount of compensation uncertainty) and to introduce a judicial exception whenever a firing (or cut in compensation) is allegedly for invidious motives or opportunistic. Opportunism exists only if one side has sunk costs that cannot be recovered by the time the other side acts; it is not a problem when an anticipated event comes to pass.
Even if the majority is suggesting that the cancellation of Wilson’s bonuses was somehow analogous to the firing of someone whose employment is at will, I do not see how his case can go forward. In the more extreme case of job loss, many people try to sue, claiming that the act of firing violated the employer’s duty of good faith and fair dealing because it was invidious or opportunistic. They regularly lose these lawsuits if they are employees at will. Indeed, recognizing a cause of action in those circumstances would spell the end of the doctrine of employment at will. (Some people might not mourn its passing, but it is firmly entrenched in Illinois law, and it is our duty to follow Illinois law in this respect.) See, e.g., Beraha, 956 F.2d at 1445 (“[F]ederal courts interpreting Illinois law have cogently reasoned that the covenant of good faith, which is a principle of construction, gives way to the rule that an employment at-will contract is terminable for any reason. Otherwise, the employment at-will principle would be meaningless.”)(citing cases); Zewde v. Elgin Cmty. Coll., 601 F.Supp. 1237, 1250 (N.D.Ill.1984) (“Illinois courts have consistently ruled that the parties to an employment at-will contract may terminate it for a good reason, a bad reason or no reason at all.... The ‘good faith’ principle does not have an independent life, and does not independently create a cause of action. Instead [it] comes into play in defining and modifying duties which grow out of specific contract terms and obligations.... It gives way to specific contract provisions which directly contradict it. Thus, the usual rule, that an at-will agreement is terminable for any reason, controls. Otherwise, that rule would be meaningless.”)(quotation marks and citations omitted).
I therefore do not agree with my colleagues that we should construe the unambiguous language in the Plan reserving the right to terminate or amend at any time, for any reason, as if there were an asterisk at the end that made an exception for changes in employment terms that might be malicious or opportunistic. What right was CEC reserving, if not the right to change the Plan if it decided that its economic interests would be better served that way? And if it has the right to terminate or amend the Plan, then I see no reason why this right did not encompass a decision to say that bonuses were not earned until all criteria were met—both the student’s enrollment, and the student’s *689 completion of the necessary courses or time.
The Plan, read as a whole, imposes three conditions before a bonus is earned: (1) that the qualifying student complete a year or a course of study; (2) that Wilson is still employed by CEC as of that time; and (3) that CEC has not as of that time exercised its right to terminate or modify the Plan. Like an at-will employment contract, the Plan was designed to allow CEC to cancel not-yet-earned bonuses for any reason—for instance, if its operating costs were unexpectedly to increase such that it could not afford to pay bonuses for students in the pipeline during a given quarter.
It is true that the duty of good faith is particularly important where, as here, one party reserves the right to modify or terminate the agreement. As we have recognized, “[w]hen one party to a contract is vested with contractual discretion, it must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously or in a manner inconsistent with the reasonable expectations of the parties.” Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc., 225 F.3d 876, 884 (7th Cir.2000). But the key question comes back to the reasonable expectations of the parties. Here, they have spelled out those expectations in CEC’s reservation of rights. Where there is an express reservation of rights to terminate or amend at any time and for any reason, as there is in our case, there is no baseline against which to find termination arbitrary, capricious, or inconsistent with expectations. The disappointed party has no right to expect non-arbitrary modification or termination, because the contract expressly declines to condition those possibilities on good cause or anything else. Just as with “at-will” employment arrangements, the employee cannot have any reasonable expectation that the Plan will be modified only “for cause.” Even taking these facts in the light most favorable to Wilson, I see nothing to indicate that CEC violated its duty not to terminate or amend the Plan in a manner inconsistent with his reasonable expectations. Indeed, the Plan expressly disavowed any expectancy of a bonus before students completed a year.
The decision to bring one’s company into compliance with federal regulations before the last minute can hardly be branded arbitrary or capricious. CEC might have had a number of good reasons to act promptly—among them, its desire to maintain a positive relationship with the ED, which regulates CEC and provides CEC’s students with federal funding. Unlike my colleagues, therefore, I would find that the district court properly rejected this theory of liability.
IV. Conclusion
While I can understand Wilson’s disappointment, the Plan to which he agreed did not entitle him to bonuses at the moment he substantially performed by enrolling students. CEC was therefore within its rights to modify the Plan when and as it did. That the Plan allowed for this disappointment does not render its promises illusory, nor does it mean that it violated a covenant of good faith and fair dealing. Accordingly, I would affirm the judgment of the district court, and I thus dissent from the decision to remand on this theory for further proceedings.