LEASE MANAGEMENT EQUIPMENT CORPORATION, Plaintiff-Appellant, v. DFO PARTNERSHIP *et al.*, Defendants-Appellees.—LEASE MANAGEMENT EQUIPMENT CORPORATION, Plaintiff-Appellee, v. BELL ATLANTIC TRICON LEASING CORPORATION, Defendant-Appellant.

First District (2nd Division)    Nos. 1—08—1033, 1—08—1199 cons.

Opinion filed June 16, 2009.—Rehearing denied July 10, 2009.

Gerald B. Mullin, of Gerald B. Mullin PC, and Sperling & Slater PC, both of Chicago (Harvey J. Barnett, of counsel), for appellant Lease Management Equipment Corporation.

Greenberg Trauric, LLP, of Chicago (Kevin D. Finger, Gregory E. Ostfeld, and Collin B. Williams, of counsel), for appellant Bell Atlantic Tricon Leasing Corporation.

Mayer Brown LLP, of Chicago (Howard J. Roin, Joshua D. Yount, Debra Bogo-Ernst, and Sarah E. Rauh, of counsel), for appellees.

JUSTICE HOFFMAN delivered the opinion of the court:

In these consolidated appeals, we consider whether the plaintiff, Lease Management Equipment Corporation (LMEC), was entitled to collect remarketing fees from the defendants, DFO Partnership, Security Pacific Leasing Corporation, Ford Motor Credit Company (collectively, DFO), and Bell Atlantic TriCon Leasing Corporation (Tri-Con), pursuant to three amended remarketing agreements. These contracts, which were executed by LMEC and Beatrice Financial Services, Inc. (BFS), the predecessor of both DFO and TriCon, related to the charters of three T-5 oil tankers, the Lawrence H. Gianella (the Gianella), the Richard G. Matthiesen (the Matthiesen), and the Paul Buck (collectively, the vessels), to the United States Navy (the Navy). Following the Navy's purchases of the three vessels in January 2003, LMEC brought suit against DFO and TriCon, seeking recovery of remarketing fees under the amended remarketing agreements. The two actions were assigned to the same judge, who conducted pretrial proceedings over the course of several years. On the first day of trial, the judge recused himself from the action against DFO (No. 03 L 8926), and that case was immediately transferred to another judge. The cases then proceeded to separate trials before different judges.

In the action against DFO (No. 03 L 8926), the court found that the sales of the Gianella and the Matthiesen to the Navy constituted remarketing events under the language of the amended remarketing agreements. However, the court also found that, based on the formula designated in the amended remarketing agreements, the net equipment proceeds derived from the sales were less than the stipulated threshold amounts, which precluded recovery of any remarketing fees by LMEC under the contracts. Accordingly, the court entered judgment in favor of DFO. LMEC has appealed that judgment.

In the action against TriCon (No. 03 L 9144), the court granted LMEC's pretrial motion for summary determination of a major issue under section 2—1005(d) of the Code of Civil Procedure (735 ILCS 5/2—1005(d) (West 2006)), finding that the net equipment proceeds derived from the sale of the Paul Buck exceeded the threshold amount stipulated in the contract. After trial, the court determined that the sale of the Paul Buck to the Navy constituted a remarketing event under the language of the amended remarketing agreement and that, at the time of the Navy's purchase of the vessel, LMEC was "standing ready" to perform remarketing services under the agreement. In light of these findings, the court determined that LMEC was entitled to a remarketing fee and, based on the designated contract formula, entered judgment in favor of LMEC in the amount of $3,850,131, including prejudgment interest. On appeal, TriCon has challenged all three of these rulings.

With few exceptions, the relevant facts are the same for both cases and are summarized as follows. The Navy's use of the Gianella, the Matthiesen, and the Paul Buck was achieved through three leveraged lease transactions. In a leveraged lease, the owner borrows money to purchase or build a capital asset with the express intention of leasing it to another party and then using the proceeds under the lease to repay the loan and earn a profit. The duration of such a lease is typically several years, and the owner receives significant tax benefits, including the depreciation of the asset over time and a deduction for the interest on the debt.

LMEC, a subsidiary of Deerpath, Inc. (Deerpath), provided remarketing services for the assets that were the subjects of leveraged lease transactions originated and structured by Deerpath. During the 1980s, Deerpath arranged the leveraged lease transactions for the Gianella, the Matthiesen, and the Paul Buck. All three vessels were owned by Wilmington Trust Company (Wilmington) as trustee under grantor trusts, and BFS was the original beneficial owner of the trusts. DFO was the successor beneficial owner of the trust that owned the Gianella and the Matthiesen, and TriCon was the successor beneficial

owner of the trust that owned the Paul Buck. Each of the three vessels was operated by a different contractor: Ocean Star Shipping, Inc. (Ocean Star), operated the Gianella; Ocean Spirit Shipping, Inc. (Ocean Spirit), operated the Matthiesen; and Ocean Freedom Shipping, Inc. (Ocean Freedom), operated the Paul Buck. For all three vessels, the Navy was the end user, and LMEC was the remarketing agent.

The primary agreements governing the relationships of the parties included (1) the three "Bareboat Charter" agreements between Wilmington and the contractors, (2) the three "T-5 Tanker Replacement Time Charter Party" agreements between the contractors and the Navy (the Time Charter agreements), and (3) the three amended remarketing agreements between LMEC and BFS (succeeded by DFO and TriCon). With respect to each of the three types of contracts described above, the documents executed by the parties were virtually identical, the only differences between them being the names of the particular vessels and the contractors.

Under each Bareboat Charter agreement, the identified vessel was leased to the respective contractor for 20 years or for a lesser period equal to the term of each Time Charter. Each Bareboat Charter constituted a "demise charter" and transferred complete possession and control of the vessel to the contractor, which furnished the crew and provided maintenance for the vessel. In addition, the Bareboat Charter agreements provided that the contractors had the right to cause BFS (succeeded by DFO and TriCon) to sell the vessels to the Navy if the Navy exercised its options to purchase under the Time Charter agreements, which were executed simultaneously with the Bareboat Charters.

Under the Time Charter agreements, the contractors retained complete and exclusive possession and control of the vessels and their navigation.[1] Each charter period consisted of a basic term of five years, with the option to renew for one or more of three successive five-year terms, totaling 20 years. Unless properly renewed, each Time Charter agreement terminated at the end of the fifth, tenth or fifteenth charter year, as the case may be. Upon expiration or termination of the Time Charter agreements, the Navy was obligated to redeliver the vessels to the contractors, unless the vessels were lost, sold or purchased by the Navy.

---

[1] "A 'time charter' is 'a contract to use a vessel for a particular period of time, although the vessel owner retains possession and control.' " *Hines v. British Steel Corp.*, 907 F.2d 726, 727 n.1 (7th Cir. 1990), quoting T. Schoenbaum, Admiralty & Maritime Law §10—1, at 381 (1987).

The Time Charter agreements also granted the Navy the option to purchase the vessels prior to the expiration of the charter periods. If the Navy exercised its option to purchase, each vessel was to be conveyed "as is, where is," and the Navy could elect to retain the respective contractor to operate the vessel after the purchase on essentially the same terms, conditions and prices.

The three amended remarketing agreements between LMEC and BFS (the predecessor of DFO and TriCon) stated that BFS desired to arrange for the services of LMEC to remarket the vessels. Remarketing was defined as "the obtaining of offers *** to purchase or lease the [v]essel from BFS at any time that the [v]essel is available to be purchased or leased." Each amended remarketing agreement provided that LMEC shall "stand ready" to remarket the vessel and shall maintain a staff capable of performing the services reasonably expected to be provided in remarketing the vessel.

The amount of LMEC's remarketing fee, if any, was to be calculated using a designated formula based on the net equipment proceeds derived from each sale. Under the designated formula, no remarketing fee was owed if the net equipment proceeds did not exceed a threshold amount. Specifically, if the net equipment proceeds were less than 20% of the basic capitalized costs for each vessel ($12,919,600 for the Gianella, $12,913,400 for the Matthiesen, and $13,658,000 for the Paul Buck), then LMEC was not entitled to collect a remarketing fee.

Several years after the amended remarketing agreements were executed, the stock of LMEC was purchased by a partnership, of which Richard Fanslow was the managing partner. In 2002, the Navy provided notice that it desired to exercise its options to purchase the vessels. The Navy ultimately agreed with DFO on a purchase price of $25 million each for the Gianella and the Matthiesen and agreed with TriCon on a purchase price of $23 million for the Paul Buck. The Navy purchased all three vessels on January 15, 2003.

After the sales of the vessels to the Navy were consummated, LMEC brought suit against DFO and TriCon, claiming that it was entitled to collect remarketing fees under the amended remarketing agreements. The defendants denied that remarketing fees were due, asserting that the Navy's purchases of the vessels did not constitute remarketing events. The defendants also contended that they were not liable for remarketing fees because, based on the designated formula set forth in the amended remarketing agreements, the net equipment proceeds derived from the sales of the vessels did not exceed the threshold amounts stipulated in the contracts.

Prior to trial, LMEC moved to exclude, under the parol evidence rule, the testimony of Duane Huffine and Ingrid Sarapuu, the individuals who negotiated the amended remarketing agreements for LMEC and BFS, respectively. Both defendants opposed LMEC's motion, pointing out that the amended remarketing agreement provided that LMEC's compensation was to be received upon the "Expiration Date" of the Time Charter agreement, which was defined as the date on which the Navy was "required to return possession" of each vessel to the contractor "pursuant to the terms of the Time Charter." The defendants asserted that, because the definition of "Expiration Date" was susceptible to more than one reasonable interpretation, the admission of parol evidence was proper. In each case, the trial judge reserved ruling on LMEC's motion and permitted the defendant to present parol evidence prior to deciding whether the language in the amended remarketing agreement was ambiguous.

Both trial judges ultimately found that the meaning of the term "Expiration Date" was ambiguous, requiring the admission of parol evidence for its interpretation. Based on these findings, the testimony of Sarapuu and Huffine was admitted in both trials.

Huffine and Sarapuu testified regarding their understandings and intentions in negotiating the terms of the amended remarketing agreements. Both Huffine and Sarapuu stated that the parties expected that the Navy would be the most likely buyer of the three vessels. Sarapuu testified that, during the negotiation of the subject amended remarketing agreements, the parties changed the definition of the term "Expiration Date" that was included in the prior contract that had served as a template for the current agreements. Under the previous contract, "Expiration Date" was defined as "the date of expiration or earlier termination of the initial lease term." According to Sarapuu, the definition of this term was altered to address her concern regarding the payment of a remarketing fee if the Navy exercised its options to purchase the vessels. Sarapuu stated that she did not believe LMEC should receive a fee if no remarketing services were performed. Sarapuu testified that the amended remarketing agreements were drafted to satisfy her expectation that remarketing fees would not be due if the Navy purchased the vessels prior to the expiration of the final charter-renewal periods.

Huffine contradicted Sarapuu's testimony that the Navy's exercise of its options to purchase the vessels did not constitute remarketing events. He agreed that the occurrence of an "Expiration Date" was necessary for LMEC to receive a remarketing fee, and he acknowledged that the definition of that term was modified during the contract negotiations. Huffine stated, however, that an "Expiration Date" oc-

curred when the Navy exercised its option to purchase because that transaction necessarily resulted in the termination of the Time Charter. Huffine also explained that the definition of "Expiration Date" was altered to address Sarapuu's concern that her company might be required to pay a remarketing fee before it actually received funds if the Navy postponed redelivery of the vessel at the conclusion of the charter period.

Upon consideration of the evidence presented, both trial judges found that the Navy's exercise of its options to purchase the vessels constituted remarketing events. However, as noted above, the courts issued conflicting rulings. In the action against DFO (No. 03 L 8926), the court entered judgment against LMEC, based on its determination that the net equipment proceeds derived from the sales of the Gianella and the Matthiesen were less than the stipulated threshold amounts. In the action against TriCon (No. 03 L 9144), the court entered judgment in favor of LMEC in the amount of $3,850,131, including prejudgment interest, based on its findings that LMEC was "standing ready" to perform remarketing services and that the net equipment proceeds derived from the sale of the Paul Buck exceeded the threshold amount stipulated in the contract. These appeals followed, and we ordered that they be consolidated for decision.

In its appeal of the judgment in favor of DFO (No. 1—08—1033), LMEC challenges the court's determination that the designated formula precluded its right to claim remarketing fees under the amended remarketing agreements. In urging affirmance, DFO argues that (1) the trial court's decision with regard to the designated formula was correct and (2) the judgment should be affirmed on the alternative ground that the sales of the Gianella and the Matthiesen to the Navy did not constitute remarketing events. In its appeal of the judgment in favor of LMEC (No. 1—08—1199), TriCon presents a similar argument, contending that the trial court erred in finding that the sale of the Paul Buck was a remarketing event.

Because the findings that the Navy's purchases of the vessels constituted remarketing events are prerequisites to LMEC's claims for fees under the amended remarketing agreements, we address this threshold issue first. Resolution of this issue requires the construction of several contract provisions. Where the language of a contract is clear and unambiguous, construction of the contract is a matter of law subject to *de novo* review. *Dean Management, Inc. v. TBS Construction, Inc.*, 339 Ill. App. 3d 263, 269, 790 N.E.2d 934 (2003). In addition, the determination of whether a contract is ambiguous is a question of law, which we review *de novo*. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153-54, 821 N.E.2d 206 (2004).

On appeal, the defendants and LMEC agree that the occurrence of an "Expiration Date" is necessary in order to claim a remarketing fee under the amended remarketing agreements. However, they disagree as to whether an "Expiration Date" occurred as a result of the purchases of the vessels by the Navy, and their disagreement is founded upon divergent interpretations of the definition of "Expiration Date."

As noted above, the term "Expiration Date" is defined as the date on which the Navy was "required to return possession of the Vessel to the Contractor [Ocean Star, Ocean Spirit, or Ocean Freedom] pursuant to the terms of the Time Charter agreement." DFO and TriCon claim that the phrase "return possession" is synonymous with "redelivery" of the physical possession of the vessels. According to the defendants, because the Navy exercised its options to purchase prior to the end of the final renewal period for each vessel, it was not "required to return possession" of the vessels to the contractors, and no "Expiration Date[s]" occurred. LMEC, on the other hand, argues that the phrase "return possession" refers to the date on which the Navy relinquishes its possessory rights under each of the Time Charter agreements. LMEC contends that, because the Navy could not be the charterer and the owner of the vessels at the same time, the purchases of the vessels in January 2003 necessarily resulted in the relinquishment of the Navy's rights under the Time Charter agreements and the occurrence of an "Expiration Date" as of the closing dates for the sales transactions.

When construing a contract, the court's primary objective is to give effect to the intent of the parties, as revealed by the language used in the agreement. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232-33, 874 N.E.2d 43 (2007). Where a contract incorporates another document by reference, its terms become part of the contract. *Estate of Willis v. Kiferbaum Construction Corp.*, 357 Ill. App. 3d 1002, 1007, 830 N.E.2d 636 (2005). If the language of an agreement is facially unambiguous, then the trial court interprets the contract as a matter of law without the use of extrinsic evidence. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882 (1999); *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291, 186 N.E.2d 285 (1962); *Armstrong Paint & Varnish Works v. Continental Can Co.*, 301 Ill. 102, 106, 133 N.E. 711 (1921). However, if the language of the contract is susceptible to more than one meaning, then an ambiguity is present, and parol evidence may be admitted to aid the trier of fact in resolving the ambiguity. *Air Safety, Inc.*, 185 Ill. 2d at 462-63. In determining whether an ambiguity exists, the court applies the "four corners rule" and looks to the language of the agreement alone. *Air Safety, Inc.*, 185 Ill. 2d at 462; *Armstrong Paint & Varnish Works*, 301 Ill. at 106.

■ We are aware that certain appellate court decisions have indicated that the "provisional admission" of parol evidence is permitted when deciding whether the language of a contract is ambiguous (see *Air Safety, Inc.*, 185 Ill. 2d at 463 (citing several Illinois Appellate Court decisions); *River's Edge Homeowners' Ass'n v. City of Naperville*, 353 Ill. App. 3d 874, 878, 819 N.E.2d 806 (2004) (also citing several appellate court decisions)). However, we decline to follow those cases as the supreme court's declaration of the "four corners rule" has never been reversed or modified. See *Air Safety, Inc.*, 185 Ill. 2d at 464-65; *River's Edge Homeowners' Ass'n*, 353 Ill. App. 3d at 880, citing *Armstrong Paint & Varnish Works*, 301 Ill. at 106. Therefore, the "four corners rule" remains binding precedent, and the trial courts in these cases were confined by that rule. See *River's Edge Homeowners' Ass'n*, 353 Ill. App. 3d at 880; *Illinois Labor Relations Board v. Chicago Transit Authority*, 341 Ill. App. 3d 751, 758, 793 N.E.2d 730 (2003). We conclude that each of the trial courts erred in allowing the presentation of parol evidence prior to finding that the contract language was ambiguous. As set forth below, we also conclude that the trial courts erred in finding that the definition of "Expiration Date" was ambiguous and that it referred to the date on which the Navy relinquishes its possessory rights under the Time Charter agreements.

Where the terms of a contract are clear and unambiguous, they must be given their plain, ordinary, and popular meaning, and the contract will be applied as written. *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 371, 875 N.E.2d 1082 (2007). A contract is not ambiguous merely because the parties disagree on a particular provision's meaning. *Rich*, 226 Ill. 2d at 371; *Central Illinois Light Co.*, 213 Ill. 2d at 153. A court will consider only reasonable interpretations of the contract language and will not strain to find an ambiguity where none exists. *Rich*, 226 Ill. 2d at 371.

■ We find that the phrase "return possession," as used in the definition of "Expiration Date," is not ambiguous, and we agree with DFO and TriCon that this phrase refers to those situations in which the Navy was obligated, under the terms of the Time Charter agreements, to redeliver the vessels to the contractors. The word "return" is commonly defined as "to pass back to an earlier possessor *** revert *** to bring, send, or put back to or in a former position." Webster's Third New International Dictionary 1941 (1993). In ordinary and popular usage, "possession" means "the act or condition of having in or taking into one's control or holding at one's disposal." Webster's Third New International Dictionary 1770 (1993). Considering these definitions, the plain meaning of the phrase "return possession" refers to the restoration of control by a party who previously exercised such

control. Redelivery under the Time Charter agreements necessarily involves the restoration of control by the contractors, as granted under the Bareboat Charter agreements. Therefore, construing "return possession" as synonymous with redelivery is consistent with the common and ordinary meaning of the terms of the amended remarketing agreements. LMEC's argument that "return possession" refers to the relinquishment of the Navy's possessory rights is not supported by the plain meaning of that phrase. Generally, the relinquishment of a right refers to a release, surrender, or renunciation (see Webster's Third New International Dictionary 1919 (1993)), which is not equivalent to a return or restoration of a right previously held by another.

Moreover, the definition of "Expiration Date" mandates that the return of possession be required "pursuant to the terms of the Time Charter[s]." Therefore, interpretation of the term "Expiration Date" compels examination of the provisions of the Time Charter agreements. Sections 5(b)(4) and 5(b)(6) of the Time Charter agreements required the Navy to redeliver the vessels to the contractors upon the termination of its use of each vessel. Yet, the Navy was relieved of its redelivery obligations if it purchased the vessels by exercising the options granted in the Time Charter agreements. Also, in the event the Navy exercised its options to purchase, each vessel was to be conveyed "as is, where is." We have found no provision in the Time Charter agreements stating that the Navy must relinquish its charter rights if it exercised its options to purchase the vessels. Rather, as LMEC has argued, that relinquishment would necessarily occur as an inevitable consequence of the Navy's purchase of the vessels. Thus, LMEC's suggested interpretation that "return possession" refers to the relinquishment of the Navy's rights under the Time Charter agreements is not supported by the provisions of those agreements.

Because LMEC's reading of the phrase "return possession" is not consistent with the plain language of the amended remarketing agreements or the terms of the Time Charter agreements, we conclude that it is not a reasonable interpretation and does not render the definition of "Expiration Date" ambiguous. Only the defendants have presented a reasonable interpretation that is supported by the language of both the amended remarketing agreements and the Time Charter agreements. We hold, therefore, that the phrase "return possession" is synonymous with redelivery and necessarily requires that the Navy terminate its use and return physical possession of each vessel in order for an "Expiration Date" to occur.

Because the Navy was not required to redeliver the vessels when it exercised its options to purchase, there was no return of possession and, hence, no "Expiration Date" as a result of any of the sales

transactions. Accordingly, we conclude that the Navy's purchases of the Gianella, the Matthiesen, and the Paul Buck did not constitute remarketing events and that LMEC was not entitled to remarketing fees under the amended remarketing agreements.

In closing, we note that our resolution of this issue would be the same even if we were to agree with the trial courts' findings that the phrase "return possession" is ambiguous, mandating consideration of the testimony of Huffine and Sarapuu. As set forth above, Sarapuu testified that the definition of the term "Expiration Date" was altered to address her concern regarding the payment of a remarketing fee if the Navy exercised its option to purchase the vessels and, therefore, no remarketing services were performed. Sarapuu stated that this change in wording was drafted to satisfy her expectation that no remarketing fee would be due if the vessel was purchased by the Navy prior to the expiration of the final charter-renewal period. Huffine stated that an "Expiration Date" occurred whenever the Navy exercised its option to purchase because such a transaction necessarily resulted in the termination of the subject Time Charter. Both trial court judges found that an "Expiration Date" occurred as a result of the Navy's purchase of each vessel. However, both of these findings were against the manifest weight of the evidence because they were not supported by competent evidence. Huffine's explanation regarding the triggering of an "Expiration Date" was contrary to the language in the amended remarketing agreements and the Time Charter agreements. Only Sarapuu offered testimony regarding the definition of "Expiration Date" that was consistent with the terms of the contract language.

In light of our resolution of this issue, we need not address the other arguments raised by the parties on appeal. For the foregoing reasons, we affirm the judgment in favor of DFO, albeit on grounds not relied upon by the trial court, and we reverse the judgment in favor of LMEC.

No. 1—08—1033, Affirmed.
No. 1—08—1199, Reversed.

KARNEZIS, P.J., and CUNNINGHAM, J., concur.