2026 IL App (1st) 242102-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
March 30, 2026

No. 1-24-2102

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE POTOMAC GROUP, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 19 CH 5328 |
| | ) | |
| OTONIEL SANCHEZ, | ) | The Honorable |
| | ) | Caroline Kate Moreland, |
| Defendant-Appellee. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirms the trial court's order granting defendant's motion for summary judgment on plaintiff's claims for breach of contract and specific performance and denying plaintiff's motion for partial summary judgment on its claim for specific performance.

¶ 2   The plaintiff, The Potomac Group, Inc., appeals from the trial court's order granting a cross-motion for summary judgment in favor of the defendant, Otoniel Sanchez, on the plaintiff's two-count first amended complaint for breach of contract and specific performance. By that same order, the trial court denied the plaintiff's motion for partial summary judgment on the count for specific performance, which the plaintiff also appeals. We affirm the judgment of the trial court.

¶ 3                                    BACKGROUND

¶ 4        The present cause of action concerns a contract dispute between the plaintiff and the defendant arising from a contract for the sale and purchase of real estate. The summary judgment record discloses the following facts pertinent to this appeal.

¶ 5        The subject property at issue in this case involves approximately 34 lots within a subdivision called the Reserve at Maynegaite, on South Nottingham Court in Olympia Fields. A townhome had been constructed on one of the lots, and 33 others were vacant.[1] The defendant had taken possession of the subject property in December 2018 after successfully bidding at a judicial sale in mortgage foreclosure proceedings involving this same property. The defendant recorded a sheriff's deed on January 10, 2019.

¶ 6        The defendant's intent for the subject property was to immediately sell it to the plaintiff. To this end, the plaintiff and the defendant entered into the subject contract on January 23, 2019. The contract included a legal description of the subject property, with the lot improved by the townhome being described as "Lot 1" and the vacant lots being described as "Lots 3 to 35." The contract contained the following provisions pertinent to this appeal, with the plaintiff being referred to as "Buyer" or "Purchaser" and the defendant referred to as "Seller."

        "3. Purchase Price. The total purchase price for the Property and lots is $255,000 (Net Proceeds). Buyer will pay $100.00 (the 'Earnest Money') upon the execution of this Agreement and then pay the remaining of the purchase price at closing.

        4. Taxes. If the Seller must redeem the sold real estate taxes prior to closing, Buyer agrees to add the amount of the redemption plus 10% to the net proceeds to be paid to the

_____

[1] The plaintiff's briefing states that the sale at issue involved 33 vacant lots, while the defendant's briefing states that only 32 vacant lots were sold. Neither party argues this discrepancy is relevant to the outcome of this appeal.

Seller. Net Proceeds shall not be reduced by the Seller's pre-payment of the sold property taxes.

5. Seller Credit. Seller shall credit Buyer 20% of the Purchase Price plus the proceeds from the sale of Lot 1 or Lots 3-35 if sold prior to the closing of this Purchase Agreement including seller's customary closing costs. The proceeds from any pre closing sale will reduce the amount Purchaser needs to close this transaction by the total of those proceeds. Seller shall not pay any settlement/closing costs/transfer taxes. All closing costs, settlement charges, transfer taxes, etc. shall be paid by the Buyer.

***

7. Closing

i. Closing Date. Closing will occur on March 25, 2019 (the 'Closing Date'), at which point Seller will transfer title to the Property to Buyer. However, either Party may unilaterally delay closing for any reason. If closing is delayed or extended as permitted by this Agreement, the Closing Date for purposes of this Agreement will be the date on which closing actually occurs. If buyer fails to close by March 25, 2019, Seller will extend the contract for an additional 30 days in exchange for an increase in the net proceeds to $285,000.00.

***

14. Cancellation of Agreement. This agreement can not be cancelled prior to the expiration of the 90 days following its execution."

¶ 7     It is undisputed that the closing contemplated for March 25, 2019, did not occur on that date. Instead, verified pleadings from a separate lawsuit filed by the plaintiff and made part of the summary judgment record in this case indicate that on March 18, 2019, the plaintiff had entered

into a separate agreement to sell 25 of the vacant lots it was buying from the defendant to buyers named David Pezzola and Brian Sak for $750,000. The closing on this separate sale between the plaintiff and Pezzola/Sak was scheduled for March 21, 2019, but it was extended into April while Pezzola and Sak sought financing. The separate agreement between the plaintiff and Pezzola/Sak was terminated on April 11, 2019, after close of business.

¶ 8 Meanwhile, on Monday, April 8, 2019, the attorneys representing the plaintiff and the defendant in the transaction at issue agreed to schedule the closing for later that week. In an e-mail dated April 8, 2019, defendant's attorney Stanley Czaja sent plaintiff's attorney Keith Spence a closing statement setting forth a total purchase price of $319,064.54. This sum reflected an increase in the net proceeds to $285,000 due to the closing being extended past March 25, 2019, as contemplated by paragraph 7(i) of the contract above. It also reflected $34,064.54 to reimburse the defendant for redeemed taxes, pursuant to paragraph 4 of the contract above.

¶ 9 On April 9, 2019, plaintiff's attorney Spence sent an e-mail to defendant's attorney Czaja that stated, "Pursuant to paragraph 5 of the Purchase Agreement, Seller shall credit Buyer 20% of the purchase price. Based on the purchase price of $255,000, the credit is $51,000. Please amend Seller's closing statement to reflect the credit." Czaja responded to Spence on April 10, 2019, in an e-mail that stated:

> "I have discussed your email with the Seller. Paragraph 5 is only operative in the event that the Seller sold either Lot 1 or Lots 3-35 prior to this closing, as the value of the combines [*sic*] parcels would be diminished because all of them wouldn't be tendered to the Purchaser. In this case, Seller has not tendered any of the parcels to a third party or to your client. As such, Paragraph 5 is inoperative and the total purchase price of $319,064.54 still applies."

¶ 10 No further communication between the attorneys is reflected in the record until April 29,

2019, when defendant's attorney Czaja sent plaintiff's attorney Spence an e-mail stating: "To date, we have not closed the subject transaction. Seller has been ready, willing and able to close this transaction. At this time, I have no choice but to declare the contract null and void based on Purchaser's inability to close the transaction." On May 1, 2019, Spence responded to Czaja by an e-mail stating, "The buyer has been ready, willing and able to close based on the terms set forth in the agreement. The seller's inability to produce an acceptable payoff caused the delay." The following day, Spence sent an e-mail to Czaja forwarding a copy of the complaint for breach of contract and specific performance that the plaintiff had filed in this case on April 25, 2019.

¶ 11    Count I of the complaint alleged that the defendant had breached the parties' contract by failing and refusing to convey the subject property pursuant to the terms of the agreement and by refusing to give the plaintiff the 20% credit that was anticipated and negotiated. In count I, the plaintiff sought money damages "including expectation damages in an amount in excess of $700,000." In count II for specific performance, the plaintiff sought an order decreeing that the defendant shall convey the subject property to it and that the plaintiff was "to pay the purchase price of $285,000 less a 20% credit to Plaintiff as set forth in the agreement." On October 29, 2019, the plaintiff filed a first amended complaint, which made no changes to the material allegations against the defendant.

¶ 12    On February 8, 2023, the plaintiff filed a motion for partial summary judgment on count II for specific performance. The plaintiff argued in summary that there was no genuine issue of material fact that the parties had a binding agreement for the purchase of real estate; that the plaintiff was ready, willing, and able to perform its part of the agreement; and that the defendant refused and continued to refuse to close on the sale. The plaintiff's motion was substantiated by the affidavit of its manager, Frederick Billings.

¶ 13　　　　Thereafter, the defendant filed a response to the plaintiff's motion for partial summary judgment and also filed a cross-motion for summary judgment on both counts of the first amended complaint. In both, the defendant's essential argument was that he had acted within his contractual rights by cancelling the contract after the parties had not closed within 90 days of contracting. He argued that the plaintiff's demanding of a 20% credit of the purchase price to which it was not entitled under paragraph 5 or any other contractual provision, together with its filing of this lawsuit seeking enforcement of this credit, constituted anticipatory repudiation by the plaintiff that excused the defendant's performance. The defendant further argued that genuine issues of material fact existed as to whether the plaintiff was ready, willing, and able to perform at the time due to Pezzola and Sak terminating their separate agreement to purchase the 25 lots on April 11, 2019, and the loss to the plaintiff of the anticipated funding from that sale. The defendant's response and cross-motion were substantiated by the affidavit of Czaja.

¶ 14　　　　On December 11, 2023, the trial court entered an order granting the defendant's cross-motion for summary judgment as to both counts and denying the plaintiff's motion for partial summary judgment on the count for specific performance. The trial court's first consideration was whether paragraph 5 of the contract entitled the plaintiff to a 20% credit of the purchase price regardless of whether the townhome or any vacant lots were sold prior to closing. The trial court found that the plain meaning of paragraph 5 was that the plaintiff was only entitled to a 20% credit if the defendant sold Lot 1 or Lots 3-35 prior to the closing. As no such sale occurred, the trial court further found that the plaintiff's demand for a 20% credit and its rejection of the closing statement omitting such credit was improper. As a result, the plaintiff could not show that it complied with the terms of the contract or that was willing to perform the contract according to its terms.

¶ 15　　　　The trial court's second consideration was that, read together, paragraphs 7(i) and 14 of the

contract allowed either party to cancel it if closing had not occurred within 90 of the contract's execution. As it was undisputed that closing had not occurred by April 29, 2019, and that this was more than 90 days after the date of contracting, the trial court found the defendant's cancellation of the contract had been proper. Accordingly, the court found that there was no evidence supporting a cause of action for breach of contract or specific performance and that the defendant was therefore entitled to summary judgment on both counts I and II of the first amended complaint.

¶ 16 Following additional motion practice not pertinent to this appeal, the plaintiff filed a timely notice of appeal challenging the trial court's rulings on summary judgment.

¶ 17                                                    ANALYSIS

¶ 18 On appeal, the plaintiff's argument is that the trial court misinterpreted paragraph 5 of the parties' contract by concluding that it did not entitle the plaintiff to receive a 20% credit of the purchase price if neither the townhome nor any of the vacant lots comprising the subject property were sold prior to the closing date. The plaintiff's position is that the contractual intent of paragraph 5 was to allow the plaintiff a 20% credit regardless of whether any lots were sold. The plaintiff argues that paragraph 5 is at least ambiguous on this point and that the ambiguity should be resolved in its favor. The plaintiff contends that, as a result of this misinterpretation, the trial court erred by ruling that the defendant was entitled to summary judgment on its counts for breach of contract and specific performance and that the trial court instead should have entered partial summary judgment in the plaintiff's favor on the count for specific performance.

¶ 19 Summary judgment is appropriate in those cases where the pleadings, depositions, admissions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2024). The record must be construed strictly against the party moving for summary judgment and

liberally in favor of the party opposing it, and summary judgment should only be entered where the moving party's right to judgment is clear and free from doubt. *Givens v. City of Chicago*, 2023 IL 127837, ¶ 46. We undertake *de novo* review of a trial court's summary judgment rulings. *Id.*

¶ 20 As stated, the plaintiff's causes of action in this case are for breach of contract and specific performance. To recover for breach of contract, the plaintiff must prove that (1) a contract exists between it and the defendant, (2) the plaintiff performed its obligations under the contract, (3) the defendant did not perform his obligations under the contract, and (4) damages resulted from the breach. *Archon Construction Co. v. U.S. Shelter, L.L.C.*, 2017 IL App (1st) 153409, ¶ 55. A claim for specific performance requires the plaintiff to prove (1) the existence of a valid, binding, and enforceable contract, (2) that the plaintiff complied with the terms of that contract or was ready, willing, and able to perform the terms of the contract, and (3) that the defendant failed or refused to perform his part of the contract. *Lobo IV, LLC v. V Land Chicago Canal, LLC*, 2019 IL App (1st) 170955, ¶ 64.

¶ 21 Our threshold consideration is whether the plaintiff could prove that the defendant failed or refused to perform his contractual obligations by demanding the plaintiff close for a purchase price higher than what the parties had agreed to by contract. This requires us to interpret whether paragraph 5 obligated the defendant, as of the anticipated closing date during the week of April 8, 2019, to allow the plaintiff a 20% credit off the purchase price, even though it is undisputed that no lots had been sold prior to that anticipated closing date. As with any issue of contract interpretation, our objective is to ascertain and give effect to the intent of the parties at the time they formed the contract. *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 77. In doing this, we first look to the language of the contract itself to determine the parties' intent. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). We construe the contract as a whole, viewing each

provision in light of the other provisions. *Id.* We may not determine intent by viewing a clause or provision in isolation or by looking to detached portions of the contract. *Id.* If the words of the contract are clear and unambiguous, then they must be given their plain, ordinary, and popular meaning. *Id.* However, if the language of the contract is reasonably susceptible to more than one meaning, it is ambiguous. *Id.* If the contract language is ambiguous, a court can consider extrinsic evidence to determine the parties' intent. *Id.* Mere disagreement by the parties about the meaning of contractual language does not mean that it is ambiguous. *Lease Management Equipment Corp. v. DFO Partnership*, 392 Ill. App. 3d 678, 686 (2009). We will consider only reasonable interpretations of contract language, and we will not strain to find an ambiguity where one does not exist. *Id.*

¶ 22     To reiterate what is set forth in greater detail in the background above, paragraphs 3 and 5 of the parties' contract state:

"3. Purchase Price. The total purchase price for the Property and lots is $255,000 (Net Proceeds). Buyer will pay $100.00 (the 'Earnest Money') upon the execution of this Agreement and then pay the remaining of the purchase price at closing.

\*\*\*

5. Seller Credit. Seller shall credit Buyer 20% of the Purchase Price plus the proceeds from the sale of Lot 1 or Lots 3-35 if sold prior to the closing of this Purchase Agreement including seller's customary closing costs. The proceeds from any pre closing sale will reduce the amount Purchaser needs to close this transaction by the total of those proceeds. Seller shall not pay any settlement/closing costs/transfer taxes. All closing costs, settlement charges, transfer taxes, etc. shall be paid by the Buyer."

¶ 23     The plaintiff argues that paragraph 5 entitled it to a 20% credit of the purchase price

regardless of whether any of the lots were sold prior to the closing. The plaintiff emphasizes the mandatory word "shall" in the first sentence. It then argues that "plus" is defined as " 'with the addition of,' " and it contends that this "means that the 20% credit was going to be provided, with the addition of the proceeds from the lots if the lots were sold." It also argues that "plus" acts to separate two distinct components: "a fixed 20% credit and an additive, conditional element of proceeds from sales." It contends that the word "if" modifies only "the proceeds from the sale of Lot 1 or Lots 3-35," which is what the contract contemplated could be sold, and that it does not modify the entire credit.

¶ 24    The plaintiff further argues that the phrase "including seller's customary closing costs" in the first sentence supports its interpretation by implying that the 20% credit encompasses those costs as a fixed concession, incentivizing the buyer in a transaction where the price could increase for delays, as occurred here. It argues that the second sentence also supports its interpretation by explicitly reiterating the conditional treatment of sale proceeds but omitting any mention that the 20% credit is conditional. The plaintiff argues that interpreting the 20% credit as conditional would render it surplusage unless lots were sold, and it contends that interpreting it this way would violate the rule that a contract must be interpreted so as not to render any of its terms meaningless or surplusage. See *Kerton v. Lutheran Church Extension Fund*, 262 Ill. App. 3d 74, 77 (1994).

¶ 25    Finally, the plaintiff argues that the trial court placed undue emphasis on the absence of a comma in the first sentence of paragraph 5. It then engages in a lengthy discussion of comma usage and dependent and independent clauses, which we need not articulate in detail. We recognize that the plaintiff's position is that under rules of grammar and punctuation, the fact that there is not a comma in the first sentence of paragraph 5 does not mean that it is prevented from receiving a credit at closing regardless of whether any lots were sold.

¶ 26     Having fully considered the plaintiff's arguments, we reject them and instead concur with the trial court that the plain meaning of paragraph 5 is that the plaintiff was entitled to a 20% credit only if the defendant sold Lot 1 or Lots 3-35 prior to the closing. Although paragraph 5 is not a model of contract draftsmanship, we find that its meaning is sufficiently clear and that it is not reasonably susceptible to the interpretation that the plaintiff seeks to ascribe to it. Reasonably interpreted, paragraph 5 contemplates that the defendant had some right prior to closing to sell the townhome or one or more of the vacant lots, presumably to a buyer other than the plaintiff; if that happened, the plaintiff agreed to complete the purchase of those lots not sold but would receive a credit off the total purchase price due to the prior sale. Paragraph 5 contemplates the allowance of one credit if such sale occurred, the precise value of which would depend on how many lots were sold in the prior sale. Paragraph 5 thus provides how the value of that credit would be calculated: "20% of the Purchase Price *plus* the proceeds from the sale of Lot 1 or Lots 3-35 *** including seller's customary closing costs." (Emphasis added.) The word "plus" strongly indicates that the parties contemplated a single credit, the value of which was to be calculated by adding those two components. We find it unlikely that the parties would have used the word "plus" in this way if they intended that the 20% credit component was to apply regardless of whether any sale occurred but that the sale-proceeds credit component was contingent on a sale occurring.

¶ 27     We further find the plaintiff's interpretation of paragraph 5 as entitling it to a 20% credit off the purchase price in all cases to be unreasonable in light of the other provisions of the parties' contract. Specifically, paragraph 3 is titled "Purchase Price" and states that the total purchase price for the property and lots is $255,000. We agree with the defendant's argument that, if the parties had intended that the plaintiff be allowed a 20% credit off that price in all instances regardless of any contingency, it would have made far more sense for them to have simply lowered the original

purchase price by 20% in paragraph 3. The fact that they instead referred to the 20% credit in paragraph 5 within a sentence that contained a contingency supports our interpretation that they intended the allowance of a 20% credit to be contingent on a sale of lots occurring prior to closing.

¶ 28    In light of this interpretation of paragraph 5, we hold that the plaintiff has failed to raise any genuine issue of material fact about whether the defendant failed or refused to perform his contractual obligations when he refused to allow a 20% credit off the total purchase price in anticipation of a closing during the week of April 8, 2019. As the plaintiff raises no other argument on appeal regarding the defendant's alleged failure to comply with his contractual obligations, including whether he rightfully cancelled the contract under sections 7(i) and 14 on April 29, 2019, we have no basis to address any further issues. The trial court's granting of summary judgment in favor of the defendant on both counts of the plaintiff's first amended complaint, along with its denial of partial summary judgment in favor of the plaintiff, was proper and is affirmed.

¶ 29                                CONCLUSION

¶ 30    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 31    Affirmed.