In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-1667

ABERDEEN DEVELOPERS, LLC,

*Plaintiff-Appellant*,

*v.*

WELLS FARGO BANK, N.A., as Trustee for Registered Holders
of Deutsche Mortgage & Asset Receiving Corporation, CD
2019-CD8 Mortgage Trust, Commercial Mortgage Pass-
Through Certificates, Series 2019-CD8, a National Bank and
LNR PARTNERS, LLC,

*Defendants-Appellees*.

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 1:23-cv-14279 — **John F. Kness,** *Judge.*

ARGUED MAY 14, 2026 — DECIDED MAY 28, 2026

Before RIPPLE, SCUDDER, and ST. EVE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Aberdeen Developers, LLC, se-
cured a loan by offering a mixed-use building as collateral.
During the COVID-19 pandemic, one of the building's largest
tenants filed for bankruptcy, allowing the loan servicer, LNR

Partners, LLC, to hold excess building revenue (like rental in-
come) in a special account as additional security. The parties
dispute how long LNR Partners may hold that excess reve-
nue. The district court dismissed Aberdeen Developers'
breach-of-contract claim, concluding that the relevant agree-
ments unambiguously favored the defendants. We disagree.
The agreements are ambiguous because both sides offer rea-
sonable constructions. So we reverse and remand for further
proceedings.

## I

In 2018, MUFG Union Bank loaned Aberdeen Developers
$41 million. Aberdeen Developers secured the loan with a
mixed-use building in Chicago worth around $73 million.
MUFG Union Bank then sold its rights as the lender to a cor-
poration that named Wells Fargo Bank as the trustee. Wells
Fargo eventually appointed LNR Partners as the loan's spe-
cial servicer. As servicer, LNR Partners makes all substantive
decisions about loan administration.

Two documents govern the loan. The first is the Loan
Agreement, which provides the general terms of the loan. The
second is the Cash Management Agreement, also known as
the CMA, which clarifies how to handle cash flow from the
mixed-use building. Aberdeen Developers and the original
lender signed and are parties to both agreements.

Things went smoothly until the COVID-19 pandemic. In
January 2021, one of the building's largest tenants filed for
bankruptcy. Under the terms of the CMA, that event allowed
the servicer to declare a Cash Sweep Trigger Event, which in-
itiated a Cash Sweep Event Period. The CMA provides special
rules that apply during a Cash Sweep Event Period. By way

of example, the CMA states that income generated by the mixed-use building must go into a Cash Management Account held by LNR Partners instead of the Borrower Operating Account maintained by Aberdeen Developers. The Cash Sweep Event Period ends only when LNR Partners determines that a Cash Sweep Cure has occurred.

The CMA also dictates how LNR Partners should apply the funds in the Cash Management Account during the Cash Sweep Event Period. Section 3.4 provides that each month, LNR Partners must disburse the funds in a certain order of priority, paying taxes, insurance, fees, and expenses before eventually holding the remainder in a subaccount as extra security or giving it back to Aberdeen Developers. Here is how the contract puts it:

> **Application of Cash Management Account Funds.** Provided no Event of Default shall have occurred and is continuing, commencing on the first Business Day of each Collection Period following a Cash Sweep Trigger Event, Lender (or Servicer on behalf of Lender) shall apply all funds on deposit in the Cash Management Account in the following amounts and order of priority, or as otherwise directed pursuant to the written instructions of Lender:
>
> (a) First, … funds in an amount required to be deposited into the Tax Escrow Fund and then the remaining balance, if any, to the Insurance Escrow Fund, shall be disbursed to Lender pursuant to the provisions of the Loan Agreement to be deposited into such

Tax Escrow Fund and/or Insurance Escrow Fund, as applicable;

…

(h) Eighth, payments for Extraordinary Expenses for the applicable period approved by Lender, if any, shall be deposited into the Borrower Operating Account;

(i) Ninth, all amounts then remaining after payments of items (a) though (h) (the "**Excess Cash Flow**"), shall be deposited into a separate subaccount (the "**Sweep Account**") to be held by Lender as additional security for the Loan; and

(j) Tenth, all Excess Cash Flow shall be disbursed to, or at the written direction of, Borrower.

CMA § 3.4 (emphasis in original).

Aberdeen Developers believes that section 3.4(j) of the CMA compels LNR Partners to return all Excess Cash Flow at the end of each month. But LNR Partners reads section 3.4(i) to allow it to hold all Excess Cash Flow until a Cash Sweep Cure occurs.

Neither party contends that a Cash Sweep Cure has occurred or will occur. As a result, LNR Partners has accumulated about $2.3 million in the Sweep Account as of the date of the First Amended Complaint. That number increases by about $150,000 every month. Should no Cash Sweep Cure occur, the sum will grow until the end of the contract term in 2029, resulting in an estimated $11.7 million in additional security.

In August 2023, Aberdeen Developers sued Wells Fargo and LNR Partners in Illinois state court, alleging a breach of contract. The defendants removed the action to federal court and then moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion, concluding the Loan Agreement and CMA unambiguously allowed LNR Partners to retain all Excess Cash Flow in the Sweep Account until the end of the contract term.

Aberdeen Developers appealed.

## II

We review a Rule 12(b)(6) dismissal without deference. See *Levy v. W. Coast Life Ins. Co.*, 44 F.4th 621, 626 (7th Cir. 2022). To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The parties agree that Illinois law applies. A breach-of-contract claim cannot be resolved on a motion to dismiss when "the language of an alleged contract is ambiguous regarding the parties' intent." *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 526 (7th Cir. 2022) (quoting *Quake Constr., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990)). In those circumstances, the interpretation of ambiguous contract language "is a question of fact." *Id.* (quoting *Quake Constr., Inc.*, 565 N.E.2d at 994).

"A contract is ambiguous if it is subject to more than one reasonable interpretation." *Gomez v. Bovis Lend Lease, Inc.*, 22

N.E.3d 1, 4 (Ill. App. Ct. 2013). "The mere fact that the parties disagree over the contract's interpretation does not suffice to establish ambiguity." *Id.* "A court will consider only reasonable interpretations of the contract language and will not strain to find an ambiguity where none exists." *Lease Mgmt. Equip. Corp. v. DFO P'ship*, 910 N.E.2d 709, 716 (Ill. App. Ct. 2009).

## III

The Loan Agreement and CMA are ambiguous because both sides offer reasonable constructions of their terms.

We begin with Aberdeen Developers. It contends that section 3.4(j) of the CMA requires LNR Partners to "disburse[]" "all Excess Cash Flow" to Aberdeen at the end of each month. CMA § 3.4(j). That construction is reasonable because the opening language of section 3.4 states that the disbursements should occur "each Collection Period," which the CMA defines as a monthly time interval. *Id.* §§ 1.1, 3.4.

Section 3.4(i) of the CMA does not expressly foreclose Aberdeen Developers' construction. While it allows LNR Partners to hold the exact same money—the Excess Cash Flow—as additional security in the Sweep Account, the provision never clarifies how long LNR Partners may do so. See *id.* § 3.4(i). Aberdeen Developers insists that the parties never intended for the Sweep Account to grow to over $11 million across the lifetime of the loan without speaking more clearly. See *Suburban Auto Rebuilders, Inc. v. Associated Title Dealers Warehouse, Inc.*, 902 N.E.2d 1178, 1190 (Ill. App. Ct. 2009) ("Courts will construe a contract reasonably to avoid absurd results."). That view is plenty reasonable.

Nor do we see anything implicit in section 3.4(i) that forecloses Aberdeen Developers' construction. It might seem odd

to say that LNR Partners receives "additional security" on such a large loan merely by retaining the Excess Cash Flow until the end of the month. CMA § 3.4(i). But section 5.1(a) of the CMA describes all of the pre-disbursement Cash Management Account funds as "additional security," and no one disputes that at least some of those funds are disbursed on a monthly basis. *Id.* § 5.1(a); see, *e.g.*, *id.* § 3.4(a). So money does not cease to provide security within the meaning of this contract just because it gets disbursed each month. See *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) ("[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others.").

Now consider Wells Fargo and LNR Partners' construction. It too is reasonable. They insist that LNR Partners may hold the Excess Cash Flow until a Cash Sweep Cure occurs. They point to section 6.3(b) of the Loan Agreement, which provides:

> Following the occurrence and *during the continuance* of a Cash Sweep Trigger Event, Borrower acknowledges that *all proceeds* on deposit in (and subsequently deposited into) the Clearing Account shall be transferred to and *held* in the Cash Management Account (as defined in the Cash Management Agreement) as additional Collateral under the Loan. Following a Cash Sweep Cure and provided no Event of Default is then occurring, all funds on deposit in the Cash Management Account shall be immediately remitted to Borrower in accordance with the Cash Management Agreement.

Loan Agreement § 6.3(b) (emphasis added).

By its terms, section 6.3(b) contemplates that "all proceeds" transferred to the Cash Management Account will be "held" in the Cash Management Account, which includes the Sweep Account, as "additional Collateral" "during the continuance of a Cash Sweep Trigger Event." *Id.* In light of this provision, it stands to reason that the money added to the Sweep Account pursuant to section 3.4(i) should be "held" by LNR Partners "during the continuance of a Cash Sweep Trigger Event"—in other words, until a Cash Sweep Cure occurs. Loan Agreement § 6.3(b); see also *Gallagher*, 874 N.E.2d at 58 ("[I]nstruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are regarded as one contract and will be construed together.").

Wells Fargo and LNR Partners' construction does not render section 3.4(j) of the CMA superfluous. In their view, section 3.4(j) still matters after a Cash Sweep Cure. Section 6.3(b) of the Loan Agreement provides that "[f]ollowing a Cash Sweep Cure," "all funds on deposit in the Cash Management Account," including those in the Sweep Account, "shall be immediately remitted to Borrower in accordance with the Cash Management Agreement." Loan Agreement § 6.3(b). The CMA in turn provides that "[i]n the event that a Cash Sweep Event Period shall no longer exist," "Lender shall either apply in accordance with Section 3.4 of this Agreement or disburse the then current balance of funds related solely to the Premises … to the Borrower Operating Account." CMA § 3.3 (cleaned up). Should LNR Partners choose to apply the funds in accordance with section 3.4 instead of immediately returning them to Aberdeen Developers, section 3.4(j) clarifies

that "all Excess Cash Flow shall be dispersed to … Borrower" in the end. CMA § 3.4(j). This view is reasonable.

*  *  *

Both sides reasonably construe the Loan Agreement and CMA. Having taken our own hard look at both agreements, we are unsure about the parties' intent. When a contract is ambiguous, we cannot resolve an Illinois breach-of-contract claim on a motion to dismiss. We therefore REVERSE and REMAND for additional proceedings.